THE PENNSYLVANIA RAILROAD COMPANY, A CORPORATION OF THE COMMONWEALTH OF PENNSYLVANIA, APPELLANT, v. THE BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 7, 1957—Decided December 27, 1957.

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. Edward J. O'Mara* argued the cause for appellant (*Messrs. O'Mara, Schumann, Davis & Lynch,* attorneys; *Messrs. Windsor F. Cousins* and *Charles E. Mechem,* of the Pennsylvania Bar, on the brief).

*Mr. Howard T. Rosen,* Deputy Attorney-General, argued the cause for respondent (*Mr. Grover C. Richman, Jr.,* attorney; *Mr. Rosen,* of counsel and on the brief).

*Mr. James M. Davis, Jr.,* argued the cause for Brotherhood of Railroad Trainmen (*Messrs. Powell and Davis,* attorneys).

*Mr. Herbert T. Heisel, Jr.*, attorney for Borough of Frenchtown and Borough of Milford.

*Mr. William R. Stem*, attorney for Union National Bank of Frenchtown and Clarence B. Fargo.

The opinion of the court was delivered by

FREUND, J. A. D.   This appeal is from a decision of the Board of Public Utility Commissioners by which the petitioner, Pennsylvania Railroad, was denied permission to discontinue passenger train service, between Phillipsburg and Trenton, New Jersey.   This branch line, called the Belvidere Delaware branch, runs north from Trenton along the Delaware River to Phillipsburg, a distance of 50.5 miles, serving the following stations:   Trenton (Clinton Street), Trenton (Warren Street), Washington's Crossing, Lambertville, Stockton, Raven Rock, Frenchtown, Milford and Phillipsburg.

The service consists of one train in the morning, No. 2359, leaving Phillipsburg at 5:52 A. M. and arriving at Trenton at 7:33 A. M., and one train in the evening, No. 2372, leaving Trenton at 5:15 P. M., and arriving at Phillipsburg at 6:58 P. M.   Although the passenger service involved runs between the terminals above mentioned, the line continues beyond Phillipsburg for another 13.5 miles to Belvidere, New Jersey.   However, the Phillipsburg-Belvidere segment is used only for freight traffic.   The equipment used on the passenger run consists of a single gas-electric self-propelled car, accommodating 77 persons, operated by a crew of three.

The figures concerning passenger traffic on this branch line adduced before the Board were as follows:

*Average Passengers Per Trip*

| | #2359 (*To Trenton A. M.*) | #2372 (*From Trenton P. M.*) |
|---|---|---|
| 1954 | 19.5 | 21.3 |
| 1955 | 17.3 | 21.0 |
| 1956 (6 mos.) | 19.2 | 21.1 |

During the periods of eight days from June 20, 1956 to June 29, 1956 (excluding Saturday and Sunday, June 23 and 24) and of five days from August 27, 1956 to August 31, 1956, the railroad recorded the starting points and destinations of the passengers on this line. The averages can be ascertained as follows:

### Train #2359 To Trenton (A. M.)

| | June 20 to June 29 Average | | August 27 to August 31 Average | |
|---|---|---|---|---|
| | On | Off | On | Off |
| Phillipsburg .............. | 2 | — | 2 | — |
| Milford ................. | — | — | — | — |
| Frenchtown .............. | 5 | — | 5 | — |
| Byram .................. | — | — | — | — |
| Raven Rock .............. | — | — | 1 | — |
| Stockton ................. | 5 | — | 4 | — |
| Lambertville ............. | 3 | — | 2 | — |
| Washington's Crossing ..... | 2 | 1 | 1 | — |
| Trenton (Warren St.) .... | — | 7 | — | 6 |
| Trenton (Clinton St.) ..... | — | 7 | — | 9 |
| Elsewhere ............... | — | 2 | | |
| | 17 | 17 | 15 | 15 |

### Train #2372 From Trenton (P. M.)

| | June 20 to June 29 Average | | August 27 to August 31 Average | |
|---|---|---|---|---|
| | On | Off | On | Off |
| Trenton (Clinton St.) ..... | 7 | — | 12 | — |
| Trenton (Warren St.) .... | 7 | — | 7 | — |
| Washington's Crossing ..... | — | 1 | — | 1 |
| Lambertville ............. | 1 | 7 | 1 | 6 |
| Stockton ................. | — | 5 | — | 4 |
| Raven Rock .............. | 1 | 1 | — | 1 |
| Byram .................. | — | — | — | — |
| Frenchtown .............. | 1 | 4 | — | 5 |
| Milford ................. | 1 | 1 | — | 1 |
| Phillipsburg .............. | — | 2 | — | 2 |
| Elsewhere ............... | 4 | 1 | | |
| | 22 | 22 | 20 | 20 |

Net operating revenues for the line in 1955 and the first six months of 1956 submitted by the railroad are as follows:

|  | 1955 | |
| --- | --- | --- |
|  | No. 2359 | No. 2372 |
| Passenger revenue | $2,394.05 | $2,921.45 |
| Costs | 25,962.22 | 25,962.22 |
| Net deficit | $23,568.15 | $23,040.77 |
| Total deficit for 1955 | | $46,608.92 |

|  | 6 Months 1956 | |
| --- | --- | --- |
|  | No. 2359 | No. 2372 |
| Passenger revenue | $1,528.63 | $1,653.30 |
| Costs | 14,817.12 | 14,817.12 |
| Net deficit | $13,288.49 | $13,163.82 |
| Total deficit for 6 mos. of 1956 | | $26,452.31 |

It should be noted that as part of the cost figure for 1955 submitted by the petitioner, $25,636.68 represents repairs on equipment. This is not an actual figure, but rather a general estimate by the railroad based on their experience in the care of this type of equipment, calculated by applying a cost per mile figure to the actual car miles made by the gas car in operation. The same method was used with the other costs, not including the crew wages. The estimated expenses for equipment seem unduly high; however, this is explained by the fact that the car in use was built in 1929, and is certainly not one of the more modern vehicles now available. For purposes of this kind of case, the actual out-of-pocket loss figure would be much more informative and realistic. Cf. *Application of Central R. Co. of New Jersey*, 41 N. J. Super. 495, 502 (*App. Div.* 1956) (herein *Central R. R. 1*).

The testimony before the Board discloses that the intermediate towns of Milford (population of 1,012), Frenchtown (population of 1,305), Raven Rock (population of 40), and Byram (population of 75) have no other means of public transportation (figures submitted for 1950). From the schedules above, it can be seen that in these localities the railroad serves an average of six persons in the morning to Trenton and seven return each evening. One of the

exhibits demonstrates that at least four of these commuters ride to and from Frenchtown. There is alternate and adequate means of bus transportation for the other towns, although to ride from Trenton to Phillipsburg by bus requires a change to a connecting bus at Clinton. The costs and time schedules are comparable for the alternate service. There is no highway that directly connects Phillipsburg and Trenton through the communities located along the railroad as there is a gap in State Highway Route 29A between Raven Rock and Byram.

The petitioner included in the record the testimony of their Manager of Passenger Rates, taken at another unrelated hearing, for the purpose of showing the over-all passenger service deficit as it affects the Pennsylvania Railroad. The 1955 operating deficit was $50,000,000, consuming 42% of total earnings on freight traffic. The first half of 1956 disclosed a deficit of $31,600,000, consuming 47% of freight profit, and the witness estimated a $58,000,000 loss for the entire year. The company's return on its investment for 1950 was 2½%, 2.45% in 1951, 2.98% in 1952 and 1953, 1.96% in 1954 and 2.87% in 1955. A stockholder who objected to the abandonment of the service testified that he was informed by railroad representatives of the payment of an extra dividend in addition to the regular dividend for the instant quarter. The Board was not provided with information concerning expenses or profits from freight service for New Jersey or the Belvidere branch line, despite the fact that there was considerable testimony showing a large volume of freight traffic on the line.

The Board, after reviewing the record in the matter, made eight findings, including the ultimate finding that public convenience and necessity require the continuance of the passenger service. They are as follows:

(1) Patronage of the trains followed a moderately declining trend during the years 1948 to 1954;

(2) The number of passengers using the trains during the years 1954 and 1955 and the first eight months of 1956 remained rather constant and reflected no definite trend;

(3) The cost of operating the trains exceeds the revenues derived by appreciable amounts;

(4) The record does not reflect financial results of operation of the Belvidere Delaware Branch as a whole or of the Pennsylvania Railroad system as a whole;

(5) Reasonably comparable substitute bus service is available between Trenton and Stockton, a distance of 19.3 miles, and for the intermediate communities of Washington Crossing and Lambertville;

(6) No bus or public transportation is available between Stockton and Phillipsburg, a distance of 31.4 miles, or in the intermediate communities of Raven Rock, Byram, Frenchtown and Milford;

(7) Discontinuance of the trains would isolate the communities of Raven Rock, Byram, Frenchtown and Milford, and would deprive the commuters and residents of these and neighboring communities of the last and only remaining means of public transportation; and

(8) Public convenience and necessity require continuance of the operation of trains No. 2359 and No. 2372.

The railroad argues in substance that the public demand for service on the line served by trains No. 2359 and No. 2372 is so minimal as to be practically non-existent; therefore the Board's decision to require the petitioner to continue the passenger service on this line is arbitrary and unreasonable, in that it is not supported by substantial evidence. More particularly, it is forcefully argued that inasmuch as it is only because of those communities without other means of public transportation (Raven Rock, Byram, Frenchtown and Milford) that the service was continued, and the *average* number of persons there using the facilities being only six in the morning and seven in the evening, to require the railroad to continue the Trenton-Phillipsburg run is to impose a financial burden on the railroad tantamount to taking its property without due process of law. It points to the net deficit for 1955 of $46,608.92 and argues that each passenger (on an average of 17 to 21 each way per day) contributes more than $2,400 a year to the company's deficit.

Consideration of the questions raised on this appeal necessarily lies within the framework of well settled prin-

ciples defining the power and function of an appellate court in reviewing the determinations of administrative agencies. We concern ourselves with whether there has been any violation of the State or Federal Constitution, whether the result is within and in accordance with the legislative grant and the standards prescribed thereby, and whether there has been fraud, bad faith, or manifest abuse of discretion amounting to arbitrary, discriminatory or capricious action. *In re Application of Hackensack Water Co.*, 41 *N. J. Super.* 408, 418 (*App. Div.* 1956); *In re Sanders*, 40 *N. J. Super.* 477, 483 (*App. Div.* 1956); *Davis, Administrative Law*, §§ 244 *et seq., pp.* 868 *et seq.* (1951). See also section 10(e), Administrative Procedure Act, 60 *Stat.* 243 (1946), 5 *U. S. C. A.* § 1009(e).

The Board's decision *sub judice,* unlike those in our two recent matters, *Central R. R. 1, supra,* and *Application of Central R. Co. of New Jersey*, 43 *N. J. Super.* 13 (*App. Div.* 1956) (herein called *Central R. R. 2*), certification denied 23 *N. J.* 473 (1957), has provided us with the necessary factual findings, which are basic to the issues herein. There is also the ultimate determination, as set out above, that "public convenience and necessity require continuance" of the trains in question. See *Davis, op. cit., supra,* § 163, *pp.* 531 *et seq.*

Our review of the agency's action where proper findings are expressed is confined to whether or not they are supported by substantial evidence—adequate to support the ultimate conclusion. *Ibid; In re Central Railroad Co. of New Jersey*, 29 *N. J. Super.* 32, 38 (*App. Div.* 1953). This court may not substitute its independent judgment for that of the administrative tribunal, but rather we allow the agency, upon whom the statutory function has been bestowed, to assume the real responsibility in weighing relevant facts and *quasi*-judicially adjudicating the controversy before it. *In re Application of Hackensack Water Co., supra; In re Sanders, supra; In re Application of Greenville Bus Co.*, 17 *N. J.* 131, 137 (1954); *In re Larsen*, 17 *N. J. Super.* 564, 577 (*App. Div.* 1952).

It is on these premises that we examine the legal basis for the Board's denial of the railroad's application to discontinue the Belvidere Branch Line passenger service.

The legal principles that govern the determination of the question involved here have been fairly well settled in New Jersey by several recent cases. *Pennsylvania-Reading Seashore Lines v. Board of Public Utility Com'rs*, 5 N. J. 114 (1950); *certiorari* denied *Brotherhood of R. R. Trainmen v. Pennsylvania-Reading Seashore Lines*, 340 U. S. 876, 71 S. Ct. 122, 95 L. Ed. 657 (1950); *Pennsylvania R. Co. v. Board of Public Utility Commissioners*, 11 N. J. 43 (1952); *Application of Central R. Co. of New Jersey* (No. 1), *supra; Application of Central R. Co. of New Jersey* (No. 2), *supra; In re New Jersey & New York Railroad Co.*, 23 N. J. Super. 1 (*App. Div.* 1952), affirmed 12 N. J. 281 (1953), appeal dismissed *New Jersey & New York R. Co. v. Board of Public Utility Com'rs*, 346 U. S. 868, 74 S. Ct. 123, 98 L. Ed. 378; *In re Central Railroad Co. of New Jersey*, 29 N. J. Super. 32 (*App. Div.* 1953).

█ From these decisions we glean that the Board of Public Utility Commissioners must consider the following factors in evaluating whether a given fact situation demands either continuance or abandonment of branch lines, in the "public convenience and necessity": (1) cost of the service; (2) use made by the public; (3) the availability and adequacy of alternate means of transportation; (4) the nature and productiveness of the corporate business as a whole. The factor of public need of the services rendered is the predominant and controlling element. *In re New Jersey and New York R. Co., supra* (12 N. J. at *page* 289); *Central R. R. 1, supra* (41 N. J. Super. at *page* 501).

█ The fact that the branch line is being operated at a pecuniary loss is necessarily an element to be considered by the Board. See *Annotation, "Right of public utility to discontinue unprofitable branch line,"* 10 A. L. R. 2d 1121 (1950). The bare showing that this is the fact is not enough to relieve the railroad of its obligation incurred by the acceptance of its franchise to operate in the

state generally. *Chesapeake & Ohio Ry. Co. v. Public Service Comm.,* 242 *U. S.* 603, 37 *S. Ct.* 234, 61 *L. Ed.* 520 (1917); *Pennsylvania-Reading Seashore Lines v. Board of Public Utility Com'rs., supra; Railroad Commission of State of Texas v. Eastern Texas R. Co.,* 264 *U. S.* 79, 44 *S. Ct.* 247, 68 *L. Ed.* 569 (1924). While this branch line of passenger service operates at a loss, it is generally recognized that railroad passenger service is a deficit operation. It is also generally recognized that much of the operating income of a railroad is provided by its freight revenues. The appellant may not benefit from its lucrative freight business and disavow its obligation to provide adequate passenger service because it finds it unprofitable to do so. 74 *C. J. S. Railroads* § 418, *p.* 992.

Where the entire railroad is operating at a deficit, and the branch line contributes to the annual loss, our courts and the Board have been open to the railroads to allow them to suspend particular service, as was done in the *Pennsylvania-Reading* case, *supra*. See also *In re New Jersey & New York R. Co., supra* (12 *N. J.,* at 288). To do otherwise would clearly violate the constitutional rights of the carriers. *Cf. Pennsylvania-Reading Seashore Lines v. Board of Public Utility Com'rs., supra.*

In the case here being considered, we have a brighter picture, since there was evidence before the Board that established the sound financial condition of the petitioner, albeit the return on its investment is not what they would deem satisfactory. In fact, the opinion of the Board specifically mentions the testimony of a Pennsylvania Railroad stockholder objecting to the discontinuance, indicating the payment of an extra dividend for the current (at the time of the hearing) period.

In a contrary view, there was some evidence before the Board concerning the general problems facing the petitioner, in attempts at reducing the parasitic services in its system. In fact, we think that it would have been not at all improper or inadvisable for the Board to take official notice of the situation of all railroads as it pertains to

passenger service and its draining effect on the total railroad financial operations. See *City of Passaic v. Passaic County Board of Taxation*, 18 *N. J.* 371, 384 (1955); *Mazza v. Cavicchia*, 15 *N. J.* 498, 514–516 (1954); *Davis, Administrative Law*, § 153, *p.* 487 *et seq.* (1951); *section* 7(*d*) *Administrative Procedure Act*, 60 *Stat.* 241 (1946), 5 *U. S. C. A.* § 1006(*d*); *Davis, "New Jersey's Unique Conception of 'Fair Play' in the Administrative Process,"* 10 *Rutgers L. Rev.* 660 (1956).

We have adverted to these considerations in *Central R. R. 2, supra* (43 *N. J. Super.*, at *page* 22) where we said:

> "* * * the continuing financial loss in the operation of commuter transportation is of serious concern not only to the railroads, but also to our economy. It may well be that the railroads should continue to absorb such losses from their profitable freight business; but no business is required indefinitely to sustain financial losses."

That this is an ever-present problem, which is in its ascendancy rather than its diminution, is an accepted fact. See Editorial, *"Rail Merger," Newark Evening News, p.* 20, November 5, 1957; *"Baruch Says Railroads Must Be Allowed to Merge," New York World-Telegram and Sun, p.* 27, November 5, 1957.

But as this court said in the *Central R. R. 2* case, the balancing of the relative needs of the railroad (including its financial security) and the passenger public, is in the first instance a question for the Board in whose province such decisions rest. *Ibid; In re Greenville Bus Co., supra*, 17 *N. J.* at *page* 137. From the record, we appreciate that these factors were adequately considered by the Board.

In discussing the criteria to be applied by the Board in the formulation of its decision, we mentioned that consideration must be given to "the availability and adequacy of alternate means of transportation." In *Central R. R. 2, supra* (43 *N. J. Super.*, at *page* 20), the court stated as follows:

> "Other factors must be considered, including the extent to which the public uses the service, and the availability and adequacy of

alternate transportation facilities. *Application of Central R. Co. of New Jersey, supra* (41 *N. J. Super.*, at *page* 501, 125 *A.* 2d at *page* 418) ; *Thompson v. Illinois Commerce Commission,* 1 *Ill.* 2d 350, 353, 115 *N. E.* 2d 622, 624 (*Sup. Ct.* 1953) ; 10 *A. L. R.* 2d, *supra,* at *page* 1143."

Properly to evaluate the import of this factor on the over-all determination of public convenience and necessity, it will be illuminating to examine the two recent decisions in the *Central R. R. 1* and *Central R. R. 2* cases.

In *Application of Central Railroad,* 41 *N. J. Super.* 495 (*App. Div.* 1956) (*Central R. R. 1*), the court determined to exercise its original jurisdiction because of the failure of the Board properly to perform its statutory function. In reversing an order of the Board, which had required the continuance of certain bus service that had previously replaced rail service, we stated that there was a "nominal" continuing demand for the bus service since an average of only five passengers in one direction and seven return used the facility. The out-of-pocket loss for operation of that portion of the service which was sought to be discontinued amounted to $14,800 a year. That decision also referred, in direct contradiction to the Board's finding, to the fact that the proposed alternate bus service would meet the requirements of public convenience and necessity, and "the affected commuters would not be unreasonably inconvenienced." *Id.,* 41 *N. J. Super.* at *pages* 502–504. The court ordered the Board's decision reversed, and the service discontinued.

In contrast, the decision in *Application of Central Railroad,* 43 *N. J. Super.* 13 (*App. Div.* 1956) (*Central R. R. 2*), after adverting to the failure of the Board to make the necessary ultimate finding, stated that the record justified the Board's ruling "that there is no alternate public transportation, and, accordingly" concluded "that public necessity and convenience require continuance of the present service." *Id.,* 43 *N. J. Super.,* at *page* 21.

Some of the operative facts in that case are as follows: The service involved was bus transportation that had pre-

viously replaced rail service between Somerville and Flemington, serving the intervening communities of Three Bridges, Neshanic, Flagtown and Raritan. An average of 12 roundtrip passengers were accommodated, including eight commuters, at an annual deficit of approximately $7,000. Examination of the record indicates that two regular commuters from Flagtown, and one from Neshanic would be without any other means of public transportation. For those who would have alternate service, there would also be additional expense and the inconvenience of a one-quarter to one-half mile walk between the bus and a railroad station with connecting New York rail service. *Id.*, 43 *N. J. Super.* at *page* 21.

Contrasting the two decisions, it is clear that one of the determinative factors was the adequacy and availability of substitute service, present in *Central R. R. 1* and absent in *Central R. R. 2*. However, in *Central R. R. 2* there was not only no substitute service for three commuters, but even where substitute facilities were present, they were grossly inadequate as they were inconvenient and encompassed additional expense. The facts in the instant matter show somewhat similar circumstances, as there was total absence of alternate means of reaching Trenton by public transportation for four communities and even difficulty with private auto as no through highway now exists. An additional factor is that the full trip from Phillipsburg to Trenton requires a change of buses with its inevitable delays.

However, nothing that was said in either of the *Central Railroad* cases was intended to suggest that the factor of alternate public service is a sole determinant of the result in a particular case. In the *Central Railroad 2* case we said:

"In weighing the relative importance of the loss and the factors indicative of public necessity and convenience, primary consideration must be given to the latter. *In re New Jersey & New York R. Co.*, 23 *N. J. Super.* 1, 8 (*App. Div.* 1952), affirmed 12 *N. J.* 281 (1953)."

The several factors we have mentioned must be balanced against each other in reaching the ultimate conclusion.

Although our cases state that public convenience lies in adequate service to the few as well as the many, and that where lack of other adequate means of transportation appears, the volume of passengers is not determinative, *Central R. R. 1* (41 *N. J. Super.*, at *page* 502) ; *Pennsylvania-Reading Seashore Lines v. Board of Public Utility Com'rs., supra* (5 *N. J.*, at *page* 121), they also demand that the Board weigh "all other relevant factors." *Central R. R. 2* (43 *N. J. Super.*, at *page* 22).

In considering the emphasis by the railroad upon the few remaining users of the service, we think it not entirely inappropriate to point out that this condition is probably largely due to the success of the railroad in obtaining a series of orders from the Public Utility Commission in the past reducing the number of passenger trains. This, together with the conceded lack of effort on the part of the railroad to stimulate passenger business, and the uncomfortable and unsatisfactory service reflected by the testimony in this case, leads to the conclusion that the small present demand for the facilities may be largely due to activity by the railroad intended to accomplish that very result.

We do not feel that the Board's determination is unwarranted in law or unsupported in fact, and therefore their result should stand.

Affirmed.