55 N.J. Super. 377 (1959)
151 A.2d 9
SUSQUEHANNA TRANSIT COMMUTERS ASSOCIATION, AN UNINCORPORATED ASSOCIATION HAVING MORE THAN 7 MEMBERS, AND BROTHERHOOD OF RAILROAD TRAINMEN, AN UNINCORPORATED ASSOCIATION HAVING MORE THAN 7 MEMBERS, APPELLANTS AND CROSS-RESPONDENTS,
v.
BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, RESPONDENT AND CROSS-RESPONDENT, PUBLIC SERVICE COORDINATED TRANSPORT, RESPONDENT, NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 1958.
Supplemental Appendix October 28, 1958.
Decided May 1, 1959.
*381 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Leon Leighton, of the New York Bar, admitted pro hac vice, argued the cause for respondent and cross-appellant New York, Susquehanna and Western Railroad Company (Messrs. Lum, Fairlie & Foster, attorneys; Mr. Leighton, on the brief).
Mr. James M. Davis, Jr., argued the cause for appellants and cross-respondents Susquehanna Transit Commuters Association and Brotherhood of Railroad Trainmen (Messrs. Powell & Davis, attorneys).
Mr. Howard T. Rosen, Deputy Attorney General, argued the cause for respondent and cross-respondent Board of Public Utility Commissioners (Mr. David D. Furman, Attorney General, attorney; Mr. Rosen, on the brief).
GOLDMANN, S.J.A.D.
Susquehanna Transit Commuters Association ("Commuters") and Brotherhood of Railroad *382 Trainmen ("Brotherhood") appeal, and New York, Susquehanna and Western Railroad Company ("Susquehanna") cross-appeals from a decision and order of the Board of Public Utility Commissioners of the State of New Jersey ("Board") dated December 11, 1957, authorizing Susquehanna to curtail its passenger train service, and from a supplemental order dated December 20, 1957 which approved the curtailed schedule. That schedule became effective January 13, 1958 after this court refused to continue a temporary stay theretofore granted.
Susquehanna originally sought a complete discontinuance of the service about to be described. During the ensuing hearings it amended its petition to change its objective to a curtailment of service, first to four round trips and later, in view of the testimony as to need for train service, to seven trips in each direction on weekdays, with no service on Saturdays, Sundays and holidays. The record is voluminous, and scores of documentary exhibits were marked in evidence, including statistical studies, financial statements and transportation schedules. While the hearings were in progress the Legislature adopted a concurrent resolution declaring that the public interest of the State required that there be no further abandonment or curtailment of passenger rail service in New Jersey pending presentation of the final report of the New York-New Jersey Metropolitan Rapid Transit Commission to the Governors and Legislatures of New York and New Jersey. By decision and order of July 3, 1957 the Board directed that in view of the declared legislative policy, further proceedings on Susquehanna's application be suspended until submission of the Commission report. Susquehanna appealed this decision, with the result that on November 25, 1957 our Supreme Court reversed the Board's decision and order and remanded the matter for further proceedings not inconsistent with its opinion. In re New York, Susquehanna and Western Railroad Company, 25 N.J. 343. The Board then proceeded to a determination on the merits of the case.
*383 Commuters and Brotherhood appeal from every part of the Board's decision and orders, and Susquehanna appeals from only so much thereof as requires it to operate trains in excess of those set out in its amended proposal, shortly to be mentioned.
On January 31, 1958 Susquehanna petitioned the Board for rehearing and reconsideration. The petition was denied. Thereafter Susquehanna, on February 24, served notice that it would apply to this court on March 10, 1958 for an order directing that additional evidence be taken before the Board, and that the Board make its findings of fact thereon. The order issued and the Board held public hearings on March 20 and 21, 1958, at which additional exhibits were introduced and testimony taken for the purpose of bringing up to date the evidence previously presented. The record of these hearings is now before us.

I.
Susquehanna's passenger service operates entirely in New Jersey, from Butler east and south through Paterson and Hackensack to the Jersey City terminal of the Erie Railroad, a distance of 36.8 miles. There are two means of access to New York City: (1) from Jersey City by Erie Ferry or the Hudson & Manhattan Railroad to midtown or downtown Manhattan, and (2) from Susquehanna Transfer, a station located 4.9 miles north of Jersey City, to the Port Authority bus terminal at Eighth Avenue and 41st Street in midtown Manhattan, by busses operated under contract by Public Service Coordinated Transport. Susquehanna also operates a branch extending 0.7 miles from the main line at Broadway station in Paterson to the Paterson City station at Straight Street in Paterson.
Prior to the institution of the curtailed service Susquehanna operated the following trains:
(1) Weekdays (Monday through Friday): 7 round trips between Jersey City and Butler, 1 round trip between Jersey City and North *384 Hawthorne, 1 round trip between Susquehanna Transfer and North Hawthorne, 1 round trip between Paterson City and Broadway, 2 westbound trips from Susquehanna Transfer to Hawthorne, 1 eastbound trip from Paterson City to Hackensack, 18 westbound trips from Susquehanna Transfer to Paterson City, and 21 eastbound trips from Paterson City to Susquehanna Transfer.
(2) Saturdays: 1 westbound trip from Susquehanna Transfer to North Hawthorne, 1 westbound trip from Jersey City to Butler, 16 westbound trips from Susquehanna Transfer to Paterson City, 16 eastbound trips from Paterson City to Susquehanna Transfer, 1 eastbound trip from Paterson City to Hackensack, 2 eastbound trips from Butler to Jersey City, and 1 eastbound trip from Paterson City to Broadway.
(3) Sundays: 1 eastbound trip from Paterson City to Hackensack, 16 eastbound trips from Paterson City to Susquehanna Transfer, and 17 westbound trips from Susquehanna Transfer to Paterson City.
(4) Holidays: 17 eastbound trips from Paterson City to Susquehanna Transfer, 18 westbound trips from Susquehanna Transfer to Paterson City and 1 eastbound trip from Paterson City to Hackensack.
There was no train service west of Paterson on Sundays and holidays.
Susquehanna's amended proposal sought to eliminate all service on Saturday, Sunday and holidays. Service Monday through Friday was to be limited to four round trips between Butler and Jersey City, serving the areas both west and east of Paterson; and one round trip between Paterson (Broadway) and Jersey City, and two round trips between Paterson (Broadway) and Susquehanna Transfer, serving only the area Paterson and east. The railroad claimed its proposal would afford complete weekday service during commuter hours, providing arrival in New York between 7:15 and 9:30 A.M., and departure from New York between 4:15 and 6:45 P.M. (The Board found that "the public need for service (Mondays through Fridays) is principally during commuter hours. (Eastbound arriving in New York between 7:00 A.M. and 9:30 A.M. and westbound leaving New York between 4:00 P.M. and 6:30 P.M.)") Susquehanna states that this proposal would take care of 1,649 of the 2,164 daily eastbound passengers (76%) and 1,365 *385 of the 1,971 daily westbound passengers (69%) carried prior to the curtailed service, thereby reducing its actual out-of-pocket passenger loss from $336,000 to $136,000 a year.
In making its determination on the merits of the case the Board was keenly aware, as it expressly stated, that it was "required to give consideration to the factors outlined by the New Jersey courts" in railroad passenger service discontinuance cases, and that as between out-of-pocket losses incident to railroad operation and the public convenience and necessity, primary consideration must be given the latter. The Board specifically found that Susquehanna "does not have sufficient overall income to safely carry the deficit of the passenger service and that extraordinary consideration should be given to the financial aspects of its operation." It realized that the cost of providing passenger service could be reduced only slightly if the operation of a train were discontinued without eliminating the cost of maintaining the equipment and providing a crew: "Only when a complete unit of equipment, crew or both can be eliminated does the discontinuance of a train produce any appreciable reduction in operating expenses."
After reviewing the decline in total passengers carried from 1947 through 1956 and the statistics showing the number of passengers carried on each of the trains then in service, the Board made the following observation, significant in relation to the central issue of public necessity and convenience:
"The service rendered by the Railroad and the bus companies, the equipment used, the character of the area served, and the number of passengers carried, all tend to show that these proceedings deal with two clearly defined areas of service. On the one hand, there is the area west of Paterson with a relatively small population, a small number of persons seeking transportation by public carrier, and an incomplete system of public transportation. On the other hand, there is the densely populated area of Paterson, Hackensack and points intermediate to New York, with a large demand for transportation, and with an extensive network of bus and rail service to satisfy the public need.
*386 So far as public convenience and necessity is related to the service rendered by the New York, Susquehanna and Western Railroad, it might be said that west of Paterson the emphasis must be on the necessity, while the area between Paterson and New York produces the emphasis on convenience or preference as to the type of transportation used. This distinction was recognized by the Railroad when it admitted that some rail service is needed in the area west of Paterson. The Company claims, however, that there is adequate alternate service in the area between Paterson and New York.
Study of the use of New York, Susquehanna and Western Railroad trains shows that there exists a need for such transportation throughout the day and on each day of the week but that the density of such traffic varies greatly during the day and on certain days. When the demand is at a high level there is no question of the need for service but there is some question of actual need when the demand is reduced. The present schedule provides a uniform service throughout the day which varies with the use of the trains. Since the service is provided and is used throughout the day the elimination of all service at certain periods might have an adverse effect on the travel programs of a large number of persons and on the alternate public transportation in the area. It is the opinion of the Board, therefore, that any relief that might be granted in this proceeding should be in the nature of a reduction of service throughout the day rather than the elimination of service during long periods of time."
The Board noted that a number of bus companies served the area between New York and Paterson and that representatives had given assurance that additional equipment could be put in service if required to handle an increased number of passengers. There is no complete bus service to and from points served by the railroad west of Paterson.
The Board's decision and order shows that it fully took into account the public need for the passenger service, alternate transportation available in the area, the effect of financial loss from passenger service on the overall operation of the railroad, the number of passengers carried on the respective trains, the equipment used and the character of the area served. The Board then specifically found that (1) the public convenience and necessity requires the operation of Susquehanna passenger service between Jersey City, Susquehanna Transfer and New York, and to stations on *387 the line to Butler; (2) continuation of service on the Paterson City branch (Broadway to Straight Street), which the railroad had sought to eliminate, was necessary to produce a maximum amount of revenue to Susquehanna; (3) there is sufficient alternate public transportation between Paterson, intermediate stations and New York to supplement the rail service; (4) the public need for service, Monday through Friday, is principally during commuter hours  eastbound arriving in New York between 7 and 9:30 A.M., and westbound leaving New York between 4 and 6:30 P.M.; (5) nearly all the passengers from stations west of Paterson can be accommodated on four round trips daily, Monday through Friday; (6) in addition, trains should be operated, Monday through Friday, between Susquehanna Transfer and Straight Street, Paterson, plus a late train from Susquehanna Transfer to Butler; (7) Saturday service should be provided by two eastbound trips between Butler and Jersey City, plus five round trips between Susquehanna Transfer and Straight Street, Paterson; (8) Sunday and holiday service should be provided by four round trips between Susquehanna Transfer and Straight Street; and (9) the present transportation of school children on trains 907 and 924 between Butler and Jersey City can satisfactorily be provided for by bus service arranged by Susquehanna. The decision and order then concluded with a listing of trains, Monday through Friday, Saturday, Sunday and holidays, approximately at the scheduled times shown on the current timetables, and directed Susquehanna to prepare and submit a curtailed schedule for the Board's approval. Such a schedule was prepared and approved by Board order of December 20, 1957.
When the matter was remanded to the Board for the purpose of updating the evidence, it reported that comparison of the passenger counts set out in the Board decision of December 11, 1957, covering January 1955, with those for January 1958, showed a substantial reduction in the number of passengers using the railroad. Thus, in January *388 1958, immediately prior to curtailment, weekday eastbound passengers averaged 2,164 daily, compared with 2,670 in January 1955 (excluding the school children who used one of the trains), a decline of 19%. Westbound passengers averaged 1,971 daily, compared with 2,517 on the earlier date (excluding the school children who used one train), a decline of 22%.
Susquehanna's position on this appeal is that it should have been given all the relief it sought; Commuters and Brotherhood argue that train service should not have been curtailed in any way. Specifically, the railroad objects to the Board's ordering the continuance of the following trains: (1) five eastbound and a similar number of westbound trains between Paterson and Susquehanna Transfer, Monday through Friday, since it would require six extra non-revenue movements to get these trains in position; (2) five eastbound and five westbound trips between the same points on Saturday, which likewise would require six extra non-revenue movements; also the two Saturday trains eastbound from Butler to Jersey City; and (3) four eastbound and four westbound trips between Paterson and Susquehanna Transfer on Sunday and holidays. In short, Susquehanna would cut weekday trains to seven each way and eliminate all trains on Saturday, Sunday and holidays, as originally proposed by it.
As stated by the railroad, the basis of its cross-appeal is that the Board's own finding establishes that those trains which operate exclusively in the area Paterson and east (except for the two trains from Butler on Saturday), and carry a nominal number of passengers, serve only "convenience or preference as to the type of transportation used"  this language being taken from the section of the decision and order quoted above  rather than necessity. Such an objective, it is argued, does not justify requiring Susquehanna to absorb the disproportionate out-of-pocket losses entailed in the operation of those trains, in the light of the Board's finding that the railroad "does not have sufficient *389 overall income to safely carry the deficit of the passenger service and that extraordinary consideration should be given to the financial aspects of its operation."
The record establishes that Susquehanna's estimated out-of-pocket loss in operating the curtailed service ordered by the Board is $200,270. The loss would be reduced to $136,063 were Susquehanna's proposed schedule to be adopted, a saving of $64,200 annually. This latter figure would be raised to $74,600 because of an additional saving of $10,400 in the annual cost of bus operation between Susquehanna Transfer and New York.
Susquehanna points out that in 1957 it failed to earn its fixed charges of $146,877. Its out-of-pocket passenger loss that year was $336,017. Under the Board's order this loss would be reduced to $200,270, so that Susquehanna would have an additional $135,747 available for fixed charges. That would still leave an annual deficit of about $11,000. It further appears that in 1956 Susquehanna failed to earn fixed charges by about $30,000. Reported income after fixed charges was $53,417, but this was realized only because of an $83,000 federal income tax refund.
The Board was unquestionably aware that Susquehanna's present fixed charges apply to a drastically reduced capitalization approved by the Interstate Commerce Commission, the bankruptcy court, and the United States Court of Appeals as "compatible with the public interest," in a reorganization proceeding under section 77 of the Bankruptcy Act. This proceeding had lasted some 16 years, the railroad emerging in May 1953. See 11 U.S.C., § 205(b) and (d); In re New York, Susquehanna & Western R. Co., 103 F. Supp. 981 (D.C.D.N.J. 1951), affirmed on opinion 196 F.2d 216 (3 Cir. 1952). The reorganization resulted, among other things, in reducing capitalization from $42 million to $16 million, and the recasting of first mortgage bonds and junior bonds. Fixed interest debt was reduced from $12 million to $5 million. The Interstate Commerce Commission had found that the reorganized company's earnings *390 available for interest and other corporate purposes in a normal year might be expected to range between $700,000 and $775,000. The exhibits show that Susquehanna's actual earnings available for fixed charges during the four years following its reorganization steadily declined, so that the rate of return on the reduced capitalization fell from 3.38% in 1953 to 0.14% in 1957. The financial tables make clear that since the reorganization Susquehanna has not earned anything like what the Commission expected it to earn, largely as a result of its out-of-pocket losses in the passenger service.

II.
We consider, preliminarily, the Attorney General's contention, made on behalf of the Board, that none of the arguments advanced by appellants and cross-appellant relating to the sufficiency of the evidence to support the Board's findings should be ruled upon in the absence of an appendix containing all the evidence before the Board. The record runs to almost 3,000 pages, and there are 276 exhibits, many of them voluminous. As Susquehanna points out, a good part of the record consists of procedural matters. Of the substantive material a considerable portion became immaterial before the Board rendered its decision, and another substantial portion was superseded by the exhibits on remand.
As for the remaining material, a very large part bears only on the issues raised by the appeal of Commuters and the Brotherhood. They have supplied no appendix whatsoever, and as to them the Attorney General's argument is completely valid. Nonetheless, we shall deal with such of their contentions as merit consideration.
As for the cross-appeal of Susquehanna, we find the material supplied in its original appendix, supplemental appendix, reply appendix and supplemental reply appendix, entirely adequate. All important financial exhibits have been printed for our information. Susquehanna contends there was substantial evidence before the Board as to the use of *391 the trains involved in the cross-appeal and the availability and adequacy of alternate means of transportation. It has supplied passenger counts for all trains, discontinued as well as continued, as well as the testimony of witnesses who used the trains which figure in the cross-appeal. It has provided timetables of the alternate means of transportation, tabulations of comparative train and bus schedules, and the testimony relating to the busses and trains suggested as alternate transportation facilities.
We consider that Susquehanna has fully complied with R.R. 1:7-1(f) relating to the appendix on appeal.

III.
In the landmark case of Pennsylvania-Reading Seashore Lines v. Board of Public Utility Comm'rs, 5 N.J. 114 (1950), certiorari denied 340 U.S. 876, 71 S.Ct. 122, 95 L.Ed. 637 (1950), our Supreme Court held that a railroad has a constitutional right to discontinue passenger train service not required by the public convenience and necessity. The court said (5 N.J., at page 121) that it would be unreasonable to interpret the Railroad Act, R.S. 48:12-99, as requiring the operation of passenger service in a situation when "only a nominal number of passengers present themselves for transportation, where other adequate means of public transportation are available, and when such operation results in continued substantial losses." The obligation to supply a particular passenger service depends upon the need; "without the need, the obligation does not exist." (Ibid., at page 126) In passing upon an application for curtailment of service the Board must, therefore, be governed by the test of public convenience and necessity, the local factor of public need of the services rendered being the predominant and controlling element. In re New Jersey & New York R.R. Co., 12 N.J. 281, 289 (1953), affirming 23 N.J. Super. 1 (App. Div. 1952); appeal dismissed 346 U.S. 868, 74 S.Ct. 123, 98 L.Ed. 378 (1953), citing *392 Alabama Public Service Comm'n v. Southern Ry. Co., 341 U.S. 341, 347, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). As was said in Chicago, B. & Q.R.R. Co. v. Wisconsin R.R. Comm'n, 237 U.S. 220, 229, 35 S.Ct. 560, 563, 59 L.Ed. 926 (1915), "desire is not a test of requirement, nor is convenience, absolutely considered."
There have been a number of New Jersey cases since the Pennsylvania-Reading case dealing with public convenience and necessity, among them Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, 11 N.J. 43 (1952); In re New Jersey & New York R.R. Co., above; In re Central R.R. Co. of N.J., 29 N.J. Super. 32 (App. Div. 1953); In re Central R.R. Co. of N.J., 41 N.J. Super. 495 (App. Div. 1956); In re Central R.R. Co. of N.J., 43 N.J. Super. 13 (App. Div. 1956), certification denied 23 N.J. 473 (1957); Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, 48 N.J. Super. 216 (App. Div. 1957). Drawing primarily on decisions of the United States Supreme Court, our courts have during recent years developed an integrated, settled body of law. As we had occasion to point out in the Central Railroad case, above, 41 N.J. Super., at page 501, among all the factual matters to be considered by the Board in determining the question of public convenience and necessity, three are of major importance: (1) the cost of providing the service; (2) the use made by the public of the service  i.e., the local need; and (3) the availability and adequacy of alternate transportation facilities. Of these, the local factor of public need for the services rendered has always been considered a predominating and controlling element. Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, above, 11 N.J., at page 51; In re New Jersey & New York R.R. Co., above, 12 N.J., at page 289. Accordingly, when there is a need for the train service, the mere showing of a loss on the particular passenger train involved does not in itself establish a right to its discontinuance. Ibid., 12 N.J., at page 286; Pennsylvania R.R. Co. v. Board of Public Utility *393 Comm'rs, above, 11 N.J., at page 51; Pennsylvania-Reading Seashore Lines v. Board of Public Utility Comm'rs, above, 5 N.J., at page 122; and see Alabama Public Service Comm'n v. Southern Ry. Co., above, 341 U.S., at page 347, 71 S.Ct. 762. This duty of a common carrier to meet the needs of the public arises from its acceptance and enjoyment of the powers and privileges granted by the State and endures so long as they are retained. Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, above, 11 N.J., at pages 50-51; Chesapeake & Ohio Ry. Co. v. Public Service Comm'n, 242 U.S. 603, 607, 37 S.Ct. 234, 61 L.Ed. 520 (1917).
No formula can, of course, be devised to determine the number of passengers which will establish whether or not the operation of a particular train is within the bounds of public convenience and necessity. In re New Jersey & New York R.R. Co., above, 23 N.J. Super., at page 9. But in its concern for local users, the Board should not overlook the fact that the interest of the general public lies in the continued operation of our railroads, and that continuing passenger service deficits may jeopardize this operation. As we said in the Central Railroad case, above, 41 N.J. Super., at page 501, public convenience and necessity "is not to be gauged by the particular persons who may be benefited at a particular locality, but it means the public generally. The effect of the Board's decision upon the whole public instead of a relatively few persons, should be taken into consideration."
There are factors other than the three principal ones just mentioned which should be taken into account in determining public convenience and necessity. The financial success of the railroad as a whole is "one of the important elements to be considered." In re New Jersey & New York R.R. Co., above, 12 N.J., at page 289. In passing upon an application to discontinue passenger service the railroad's revenues from freight are not to be overlooked. In re Central R.R. Co. of N.J., above, 29 N.J. Super., at page *394 34; cf. Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, above, 48 N.J. Super., at page 226; Chicago, Milwaukee, St. P. & P.R. Co. v. Illinois, 355 U.S. 300, 307, 78 S.Ct. 304, 2 L.Ed.2d 292 (1958). (In this connection, we observe that Susquehanna's out-of-pocket losses in the passenger service have absorbed a disproportionate percentage of its total freight earnings in the period 1947-1957. Thus, they absorbed 40.92% in 1955, 50.55% in 1956, and 93.62% in 1957. Freight earnings have been in steady decline.)
The Board may also properly consider whether the railroad is furnishing service that is reasonably adequate in point of frequency and speed. In re Central R.R. Co. of N.J., above, 29 N.J. Super., at page 36; Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, above, 11 N.J., at page 50. The Board must be alert to detect attempts by the railroad to discourage passengers by bad service, Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, above, 48 N.J. Super., at page 230. (Our review of the entire record does not persuade us, despite the contrary arguments of Commuters and the Brotherhood, that such a situation is present here.) The Board may also be influenced by reasonable expectations of future demand for the service, based upon developments under way in the territory served by a particular train or trains. In re N.Y., Susquehanna & Western R.R. Co., 25 N.J. 343, 351 (1957). Finally, where substitute transportation facilities are available, the Board must determine whether they are comparable and satisfactory. It must be established that the substitute facilities, here the remaining Susquehanna trains, the trains of the Erie Railroad, and the busses of the Inter-City Transportation Co., Manhattan Lines, Westwood Transportation Lines and Public Service Coordinated Transport, have the capacity to handle the additional passengers that might result from the discontinuance of the trains in question. In re New Jersey & New York R.R. Co., above, 12 N.J., at page 290. The substitute trains or busses should service all the communities served by the applicant railroad. Ibid. There is *395 no question here about the availability of comparable and satisfactory substitute transportation facilities.
The Legislature has entrusted the Board with the complex problem of weighing the many relevant factors and formulating policy in cases like this. We will not set aside its determination of public convenience and necessity where there is a reasonable basis for its action. In re Delaware, Lackawanna & Western R.R. Co., 25 N.J. 353, 356 (1957); In re Greenville Bus Co., 17 N.J. 131, 137 (1954). The now generally accepted gauge of administrative factual finality is whether the factual findings are supported by substantial evidence. Hornauer v. Division of A.B.C., 40 N.J. Super. 501, 504 et seq. (App. Div. 1956), and cases there cited; and see Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 455 et seq. (1958) (dissenting opinion).

IV.
Susquehanna's main argument is that in fixing the present schedule the Board based its decision on the "convenience or preference" of the riding public, rather than on the need for service. Convenience or preference, it contends, may be a satisfactory standard in determining whether to authorize a new carrier to enter a particular area in competition with an existing carrier. It points out that the Board and the courts have recognized that the public is entitled to the additional benefits of such a competitive service offered by a new carrier, and certificates would issue, unless "the establishment of the new line will substantially prejudice existing lines with consequent adverse effects on the traveling public." In re Greenville Bus Co., above, 17 N.J., at page 142. However, in passenger train curtailment cases, says Susquehanna, the Board, in determining whether a carrier may constitutionally be required to continue an unprofitable and burdensome service, must apply the test of public need, and not the convenience or preference of the riding public.
Susquehanna's claim that the Board based its decision *396 on mere "convenience or preference" insofar as the trains which it would discontinue are concerned, is based on the use of that language in the Board's discussion of the difference in the areas served by the railroad west and east of Paterson. This part of the Board's decision is quoted at length under I, above. The Board there pointed out that the area west of Paterson had a small population, few people seeking transportation by public carrier, and an incomplete system of transportation, contrasted with the densely populated area east of Paterson, with its large demand for transportation and an extensive network of bus and train service to satisfy the public need. The Board then said that insofar as public convenience and necessity was concerned, "it might be said that west of Paterson the emphasis must be on the necessity, while the area between Paterson and New York produces the emphasis on convenience or preference as to the type of transportation used." Although this comment, standing by itself, would suggest that "convenience or preference" dictated the Board's decision as to the trains in question, examination of the entire decision shows that the Board was completely aware that "public convenience and necessity" (or "public need") was the controlling factor, as laid down in our cases. Aside from the single reference to "convenience or preference" just mentioned, the rest of the decision shows that the Board's thinking was completely guided by considerations of public convenience and necessity. Carefully reading the opinion in its entirety, we cannot find that the Board divided up the standard by applying "convenience and preference" to some cases, and "necessity" to others.

V.
Commuters and the Brotherhood attack that part of the Board's order authorizing the consolidation or elimination of certain trains. Prior to curtailment Susquehanna had operated two train services. Four self-propelled rail Diesel cars (RDC) provided service between Paterson and Susquehanna *397 Transfer, the train numbers being known as the 800 series. Service between Jersey City and stations west of Paterson was provided by conventional passenger coaches and Diesel locomotives. There were 22 passenger coaches, including 16 modern stainless steel units, available for this operation, the train numbers being known as the 900 series. The latter trains duplicated the service of the 800 series trains at stations Paterson (Broadway) and east. Operation of the four RDC units required five crew assignments, operation of the 900 series trains seven crew assignments, Monday through Friday. Agreements with labor unions provided that crews assigned to Diesel trains could not operate the RDC trains, and vice versa.
Because of the additional crews required and the duplication of services, the RDC service resulted in out-of-pocket losses of about a third of the total. To reduce these losses Susquehanna proposed to consolidate four RDC eastbound morning trains with four Diesel trains which left Paterson (Broadway) shortly after the former, and also to consolidate three of the RDC westbound evening trains with three Diesel trains arriving at Paterson (Broadway) shortly after the former. The Board, considering public convenience and necessity, authorized consolidation of the four eastbound trains and one of the westbound trains. We find its action proper. Consolidation resulted in a reduction of only 123 passengers, or 5% of those who had used these trains just prior to consolidation. Although the annual revenue lost from passengers on the five consolidated 800 series trains amounts to some $16,100, Susquehanna benefited by the elimination of a much larger sum representing annual out-of-pocket losses on these trains. On this cross-appeal it seeks to eliminate the balance of that loss through the consolidation of the two other westbound evening trains, known as 835 and 837. We will consider this matter shortly.
Commuters and the Brotherhood attack that portion of the Board's order refusing to direct Susquehanna to retain its four RDC cars, and the railroad's sale of the cars to *398 the Central Railroad Company of New Jersey pending the appeal. Susquehanna's intention to sell these cars was fully disclosed on the previous appeal, and the matter was remanded to the Board for the exercise of its expert judgment. See In re N.Y., Susquehanna & Western R.R. Co., 25 N.J. 343, 352 (1957). The Board decided not to order Susquehanna to retain the cars, properly holding that it did not have the power to compel the operation of a particular type of equipment with special features, but was limited to action against the use of unsafe, unsanitary or otherwise improper equipment. See R.S. 48:2-23. There is nothing in the record to suggest that the equipment presently used is not safe, adequate and proper. In this connection we note that the question of retaining the RDC cars was argued before us as a separate issue on the application of Commuters and the Brotherhood for a stay of the Board's order. At that time counsel for the railroad stated that a sale of the equipment was currently being negotiated, and stressed that there would be irreparable damage to Susquehanna if the sale were stayed. We denied the application for the stay. We consider the matter moot.

VI.
The Board authorized elimination of a number of trains operating Monday through Friday in the area Paterson and east  16 east from Paterson and 14 west to Paterson, after giving full consideration to public convenience and necessity. A study of passenger tables indicates that the number of passengers on most of these trains was nominal. Only four operated during commuter hours. Bus and train schedules supplied in the appendix show that the trains operated in an area which, as the Board found, had "an extensive network of bus and rail service to satisfy public need." The alternate transportation facilities available would unquestionably be adequate to deal with the small numbers of passengers who used the eliminated trains.
*399 The Board further authorized the elimination of 12 eastbound and 13 westbound trains in the area Paterson and east, operating on Saturday. The few passengers carried, and the availability of satisfactory alternate transportation, fully supports the Board's conclusion that public convenience and necessity did not require these trains.
In the area west of Paterson, the Board authorized elimination of three trains eastbound from Butler and three trains westbound to Butler, Monday through Friday, and one westbound train on Saturday. These trains carried few passengers. (One morning and one evening train, Nos. 907 and 924, carried school children, but these were provided for by bus service. See XIII, below.) The Board correctly found that nearly all of them could be accommodated on the four round trips per day, Monday through Friday, made by trains that were retained.
Appellants Commuters and Brotherhood are not correct when they argue that as a result of the Board's order 2,000 out of 5,700 passengers left the Susquehanna service. As of January 1955, there were 5,187 passengers in both directions. Of these 1,052 left the railroad between that date and January 1958, before there was any curtailment of service. The curtailment resulted in a loss of 739 passengers in both directions. It is reasonable to conclude that most of these passengers travelled both ways, so that there was a loss of about 526 daily passengers before curtailment and 370 thereafter.

VII.
It is appropriate to consider here the vigorous attack which Commuters and the Brotherhood make upon Susquehanna's operation of so-called "dead-head" passenger trains (trains which do not carry passengers). They point out that in the course of a week the railroad runs 900 "dead-head" passenger train miles. The Board did not require these trains to be opened to passengers because it found no public *400 need therefor. In its supplemental findings of fact on the remand the Board determined that a transfer of present non-revenue train operation to revenue operation would result in an increase of $9,727 in revenue a year, assuming no reduction in patronage due to schedule changes.
Susquehanna frankly states that it would be most anxious to get this additional revenue of some $800 a month. It concluded to forego it because counsel for the railroad feared that opening these trains to passengers might seriously prejudice the savings of some $6,200 a month which Susquehanna hopes to realize on this cross-appeal. We are informed that the "dead-head" movement of trains actually involves 180 miles each day except Sunday, or 1,080 miles a week. Half of this daily mileage represents "placing" movements  the moving of a train between a crew terminal and the passenger terminal. The remaining 90 miles daily represent "complemental" movements in order, for example, to enable the crew and equipment from an eastbound (or westbound) revenue train to return to the starting point to operate a second eastbound (or westbound) revenue train. The Board's schedule makes it necessary to operate six such complemental movements daily and Saturday.
Susquehanna argues that if it voluntarily opened these "dead-head" trains to passengers, it could not on this appeal ask for an order authorizing their discontinuance. If it had asked the Board to direct that these trains be opened to passengers, solely in order to lay a basis for appeal therefrom, it feared that the court might dismiss the appeal. It further points out that if this court should grant its cross-appeal, the railroad could immediately eliminate the revenue trains involved, and also their complemental movements.
We need not consider the matter further. Any trains we might decide should be eliminated on Susquehanna's cross-appeal will, of course, resolve the "dead-head" operation connected therewith. In the case of such trains as are not eliminated, the Board may order the opening of the trains *401 to passengers instead of running them "dead-head," if this will bring additional revenue to Susquehanna.

VIII.
Brief reference might also be made to the Board's determination that the service on the 0.7 mile branch running from the main line at Broadway Station, Paterson, to Straight Street, Paterson, is necessary in order to produce a maximum amount of revenue to the railroad. The Board here was obviously concerned with the financial aspects of the operation, and not with the actual need for the service. The Board found that the revenue to be derived from the Paterson City (Straight Street) passengers would outweigh the additional cost of running the branch trains. Although Susquehanna made this portion of the order part of its cross-appeal, it has concluded that there is not sufficient evidence to overcome the Board's findings on that one issue and has therefore withdrawn this feature of the cross-appeal.

IX.
Before turning to a consideration of the additional trains which Susquehanna would eliminate from its schedule, we deal with the suggestion made on behalf of the Board by the Attorney General that "it is easy to overstate the railroad's financial difficulties." This flies in the face of the Board's specific finding, already mentioned, that Susquehanna "does not have sufficient overall income to safely carry the deficit of the passenger service and that extraordinary consideration should be given to the financial aspects of its operation."
The Attorney General states that "No company is entitled to a guaranteed rate of return." However that may be, Susquehanna has since its reorganization earned only between 0.14% (in 1957) and 3.38% (in 1953 when it emerged from reorganization) on the greatly reduced capitalization *402 which the Interstate Commerce Commission and the United States Court of Appeals found to be compatible with the public interest. This should be contrasted with rates of return well over 5% which the Board found to be within the range of reasonableness for electric and telephone companies, which findings were approved by the Supreme Court. See In re N.J. Power & Light Co., 9 N.J. 498, 534 (1952); In re N.J. Power & Light Co., 15 N.J. 82, 85 (1954); N.J. Bell Tel. Co. v. Board of Public Utility Comm'rs, 12 N.J. 568, 600-601 (1953). As Susquehanna points out, these industries have earnings more stable than in the case of railroads. Susquehanna's return on capitalization is not such as, in the language of Public Service Coordinated Transport v. State, 5 N.J. 196, 225 (1950), "should be sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties."
We have heretofore discussed certain aspects of Susquehanna's finances. Examination of the financial tables shows that continuing out-of-pocket losses from passenger service have had to be taken up by freight earnings. These earnings have precipitously declined since 1950 (from $1,148,764 to $358,900), in large part because of the loss of freight business when the Ford Motor Company moved from Edgewater to Mahwah, N.J. As a result, the percentage of freight earnings required to absorb the out-of-pocket passenger losses has, as noted above, increased  from 32% in 1952 through 1954, to 41% in 1955, 51% in 1956 and 94% in 1957 (round figures). The "lucrative freight business" which was present in Pennsylvania R.R. Co. v. Board of Public Utility Comm'rs, above, 48 N.J. Super., at page 226, just does not exist here to offset passenger revenue losses.
Commuters and the Brotherhood charge Susquehanna's present management with inefficiency, in contrast to the *403 preceding trusteeship. The former trustee continued with Susquehanna until mid-1955. In spite of everything he did, freight earnings declined from about $1,150,000 in 1950 to about $777,000 in 1954. Income available for fixed charges in the two years after the termination of the bankruptcy in 1953 fell short by far of what the Interstate Commerce Commission anticipated it would be. Freight earnings declined even further in 1955 and 1956 as a result of the removal of the Ford plant, and again in 1957 (to $358,900) as a result of the depression in the railroad industry along the eastern seaboard.
The same charges of inefficiency made on this appeal were leveled during the hearings. The Board apparently found them without basis in fact, as do we.
The Board was entirely correct in taking into consideration the financial figures relating to the Susquehanna operation. As noted in our discussion under III above, the Board could not, in its concern for local users, ignore the interest of the general public in the continued operation of the railroad, or shut its eyes to the fact that continuing passenger service deficits might jeopardize the entire operation. See In re Central R.R. Co. of N.J., above, 41 N.J. Super., at pages 501-502, and the dissenting opinion in In re New Jersey & New York R.R. Co., above, 12 N.J., at pages 290-291.

X.
We deal, now, with those trains which Susquehanna wants us to eliminate from the curtailed schedule approved by the Board, totalling 30 in number, and all but two running in the area Paterson east. These two operate from Butler east early each Saturday morning. Of the remaining 28, there are five each way, Monday through Friday; five each way on Saturday; and four each way on Sunday and holidays, all operating from Paterson east.
A fair reading of the Board's decision and order of December 11, 1957 indicates that it considered that the public *404 convenience and necessity requires the operation of these trains, as well as the others it ordered run. However, it did not specifically make such an ultimate finding as to each of the 30 trains in question, or any group of them. Susquehanna contends that the Board's order, insofar as these trains are concerned, violates essential principles of administrative determination, requiring the vacating of the order to that extent. The argument is made that such a determination must be accompanied by findings of fact sufficient to support it, and that there must be sufficient or substantial competent and relevant evidence to support these findings.
It is basic to the administrative process that the determination of an administrative agency like the Board be accompanied by basic findings of fact sufficient to support it. The requirement of such findings has been held to be "far from a technicality and is a matter of substance. It has been said that it is a fundamental of fair play that an administrative judgment express a reasoned conclusion." N.J. Bell Tel. Co. v. Communications Workers, etc., 5 N.J. 354, 374-375 (1950). Quoting from the leading case of Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App. D.C. 282, 96 F.2d 554, 559 (Ct. App. D.C. 1938), certiorari denied 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938), the court in that case outlined the process which an administrative agency must follow in reaching a decision:
"* * * (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion."
See, also, Abbotts Dairies, Inc. v. Armstrong, 14 N.J. 319, 332-333 (1954); In re Greenville Bus Co., 17 N.J. 131, 146 et seq. (1954).
*405 The Board here failed to make the necessary basic findings of fact that would establish the ultimate finding of public convenience and necessity for the 30 trains involved on Susquehanna's cross-appeal.
The Attorney General seems to rely on the Board's statement that "the elimination of all service at certain periods might have an adverse effect on the travel programs of a large number of persons and on the alternate public transportation in the area." (Italics ours) This was, at best, a general statement made in passing and does not meet the requirement that the grounds upon which an administrative agency acts be "clearly disclosed and adequately sustained." In re Plainfield-Union Water Co., 11 N.J. 382, 396 (1953), quoting from Securities and Exchange Comm'n v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). It is not a finding that alternate available transportation facilities are inadequate. All that the Board expressed was a fear that they might become inadequate if the trains were discontinued. The record reveals no factual basis for such conclusion. Indeed, it establishes that alternate facilities are, and in the reasonably foreseeable future will continue to be, entirely adequate to take up the relatively few passengers who use the trains. The Board, as already stated, found that there was "an extensive network of bus and rail service to satisfy the public need." It pointed out that three of the bus companies which connect Paterson and intermediate towns with New York City own a combined total of 268 busses and carried over 8 million passengers. (Compare this with the 1 1/2 million passengers carried by Susquehanna.) It also noted that representatives of the bus companies had stated they could place additional equipment in service, if required to handle any increased number of passengers. The Board made no specific finding as to alternate rail service. We note that Paterson is the origin and destination of most of the passengers on the trains involved. We have before us a timetable of the Erie Railroad. Its main line serves Paterson, with *406 35 trains eastbound and 33 trains westbound, Monday through Friday; 21 trains eastbound and 23 trains westbound on Saturday; and 15 trains in each direction on Sunday. Erie has adequate equipment to care for the Susquehanna passengers.
There must, of course  as Susquehanna correctly argues  be sufficient or substantial competent and relevant evidence to support such findings of fact as an administrative agency makes. The Public Utilities Act gives this court, as successor to the former Supreme Court, power to set aside any order of the Board "when it clearly appears that there was no evidence before the Board to support the same reasonably * * *." R.S. 48:2-46. In Public Service Gas Co. v. Board of Public Utility Comm'rs, 84 N.J.L. 463, 466 (Sup. Ct. 1913), affirmed on opinion 87 N.J.L. 581 (E. & A. 1914), writ of error dismissed 242 U.S. 666, 37 S.Ct. 243, 61 L.Ed. 552 (1917), the court, construing this statutory provision, said that "It needs no act of the legislature to confer on us the power to review the action of an inferior tribunal, and the legislature cannot limit us in the exercise of our ancient prerogative." This language was repeated with approval in Central R.R. Co. of N.J. v. Dept. of Public Utilities, 7 N.J. 247, 259-260 (1951). Our courts have always had the power, independently of the statute and of R.R. 4:88-13, of "testing the evidence in the crucible of substantial evidence" to determine whether the administrative agency's action can be supported.
Basic to Susquehanna's position on the 30 trains in question is that the order to continue their operation at a substantial loss deprives the railroad of its property without due process, unless the trains are actually required by public convenience and necessity. See Pennsylvania-Reading Seashore Lines v. Board of Public Utility Comm'rs, 5 N.J. 114, 129 (1950); In re New Jersey & New York R.R. Co., 12 N.J. 281, 286 (1953). It maintains that this case warrants even stricter insistence on the substantial evidence rule than cases which do not impinge on constitutional rights. *407 In Lakewood Express Service, Inc. v. Board of Public Utility Comm'rs, 1 N.J. 45 (1948), the court had before it a regulation of the Board prohibiting the use of passenger-sedan automobiles for autobus service. Acknowledging the rule that the court ordinarily would not presume to substitute its judgment for that of the Board where there was proof to support its determination, the court went on to declare (1 N.J., at page 52) that its power to review was clear, and to say that an agency's findings of fact "may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards," quoting from St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 52, 56 S.Ct. 720, 726, 80 L.Ed. 1033 (1936).
Before proceeding to a consideration of the evidence insofar as it relates to the 30 trains, brief comment should be made concerning the following statement in the Board's brief: "The position of the Board is that, drawing upon the experienced resources of its accounting, engineering and transportation staff, it fairly considered all pertinent factors and the decision in the case represents its best judgment on the evidence before it." The argument is inadmissible on its face.
The proceeding before the Board was not one of ordinary administration, conformable to the standards governing duties of a purely executive nature, ministerial in character. The statutory function it exercised had a judicial quality. The ascertainment of facts from the evidence adduced at public hearings, and the application of the prescribed standard, partook of the attributes of a judicial inquiry, so that the proceeding is deemed quasi-judicial and subject to the requirements of due process. Cf. Pennsylvania R.R. Co. v. N.J. State Aviation Comm'n, 2 N.J. 64, 70 (1949); Morgan v. United States, 298 U.S. 468, 56 S.Ct. *408 906, 80 L.Ed. 1288 (1936). As was said in Morgan, the hearing provided by the statute is designed "to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. The `hearing' is the hearing of evidence and argument." The requirement of a hearing "has reference to the tradition of judicial proceedings in which evidence tested for testimonial trustworthiness in the mode sanctioned by experience is received and weighed by the triers of the facts to the exclusion of extraneous circumstances." In re Plainfield-Union Water Co., 11 N.J. 382, 392 (1953). The court in that case observed that although the common law rules of evidence do not apply strictly to administrative tribunals, "there must needs be observance of the fundamentals of fair and adequate procedure constituting due process  the fair play traditional in Anglo-American justice."
The Board's determination cannot be made to rest upon undisclosed evidence or information outside the record, which the parties in interest never had an opportunity to test for trustworthiness and to explain or rebut. Pennsylvania R.R. Co. v. N.J. State Aviation Comm'n, above, 2 N.J. at page 72. In Mazza v. Cavicchia, 15 N.J. 498 (1954), a leading case on the question of the exclusivity of the record in an administrative proceeding, the late Chief Justice Vanderbilt said
"In any proceeding that is judicial in nature, whether in a court or in an administrative agency, the process of decision must be governed by the basic principle of the exclusiveness of the record. `Where a hearing is prescribed by statute, nothing must be taken into account by the administrative tribunal in arriving at its determination that has not been introduced in some manner into the record of the hearing.' Benjamin, Administrative Adjudication in New York, 207 (1942). Unless this principle is observed, the right to a hearing itself becomes meaningless. Of what real worth is the right to present evidence and to argue its significance at a formal hearing, if the one who decides the case may stray at will *409 from the record in reaching his decision? Or consult another's findings of fact, or conclusions of law, or recommendations or even hold conferences with him?" (at page 514)
This court, speaking through Judge (now Justice) Francis, had occasion to discuss the problem in another setting in N.J. State Board of Optometrists v. Nemitz, 21 N.J. Super. 18 (App. Div. 1952). The board there sought to justify its conclusion that defendant had supplied lenses not in accordance with the prescription issued, by stating that the board members were all experts and it must be assumed that their opinions were contrary to defendant's. We characterized this as a "startling theory" which, if recognized, "would not only render absolute a finding opposed to uncontradicted testimony but would render the right of appeal completely inefficacious as well." We went on to say that
"* * * A board of experts, sitting in a quasi-judicial capacity, cannot be silent witnesses as well as judges. Their value as experts in the judging process contemplated by the statutory disciplinary proceeding, consists in the application of their special knowledge to the factual controversy appearing within the record made at the hearing. (Italics the court's)
The very essence of due process is the opportunity to hear and controvert the evidence upon which the issue presented is to be decided. Factual knowledge on that issue, expert or otherwise, of the triers of the facts is not evidence and cannot form the basis in whole or in part of the ultimate judgment. Morgan v. U.S., 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). To sanction such practice would be to frustrate the fundamental right to a hearing. * * *" (at page 28)
See, also, Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 303-304, 57 S.Ct. 724, 81 L.Ed. 1093 (1936); In re Plainfield-Union Water Co., above, 11 N.J., at page 393.
The expertise of the Board or of its staff is not a brooding presence whose cloak of anonymity may be thrown around its findings and conclusions. Whatever actually plays a part in the decision of the Board should be known to the *410 parties and subject to being controverted. Benjamin, Administrative Adjudication in New York, 208 (1942).
The record here is exceptionally complete. If there were additional persuasive facts and circumstances that merited consideration, they undoubtedly would have been produced, either by the objectors or by the Board itself, in the course of the Board's exhaustive exploration of the Susquehanna problem. It is to be remembered that Susquehanna filed its petition in April 1956. The Board considered the matter on 26 different occasions before filing its decision and order of December 11, 1957. Thereafter it had further opportunity to deal with the application at two public hearings in March 1958, called at the direction of this court for the taking of additional evidence and the making of findings of fact thereon.
A remand has been suggested, so that the Board might possibly make a statement on the record of its official notice of certain additional facts and circumstances that might have influenced its decision, with opportunity afforded the parties to meet such data by evidence and argument. This amounts to nothing less than a complete rehearing of a matter already carefully considered and determined. As will shortly be demonstrated, the Board's determination is not substantially supportable in fact. As always, it is the facts established on the record, and only those facts, that are the vital consideration. We cannot move to a conclusion that the determination of the Board may be sustained because substantially supportable in policy. "Policy" is a vague and amorphous expression  a shifting and indefinite determinant.
The problem of the commuter is admittedly an ongoing one, particularly critical today in the northern metropolitan section of our State. It has never been considered in its total aspect, at least on an official, administrative level. There have been a number of special and general studies, such as the January 1958 report of the Metropolitan Rapid Transit Commission. The Legislatures of New Jersey and *411 New York are presently considering various approaches to a possible solution of commuter transportation. However, there is as yet no authoritative, official answer to the problem.
We do not, of course, deny the possibility of the Board considering  but only on record proofs  the overall problem of mass transportation in northern New Jersey in a situation where it is called upon to determine whether the public convenience and necessity requires the operation of certain trains, as here. But we are of the firm opinion that the growing crisis in railroad transportation does not justify the Board's ordering the continued operation of trains which are not shown to be required by public convenience and necessity.
We should not be led into the errant path of trying to support the Board's decision by projecting the possibility that somewhere in the undefined background of its administrative experience there may exist policy factors which produced the determination under review. The Board is by now well versed in the legal principles which control its administrative proceedings, from the initial application, through the hearings and down to its final decision and order. No policy factors applicable to the trains discussed in XI below were exposed in the course of the hearings, nor were any formulated, either clearly or by implication, in the Board's final determination. As heretofore stated, we ordinarily sustain the exercise of administrative judgment where the findings are supported by substantial evidence. We cannot sustain it on a record as comprehensive and detailed, and as carefully presented and considered, as the one before us, where the proofs inevitably lead to an opposite conclusion, as shown below.

XI.
We proceed to discuss the several trains to whose continuance in service Susquehanna objects. We have already *412 stated that the Board's determination to continue these trains was not accompanied by basic findings of fact necessary to support it. No purpose would be served, and it would only result in additional delay, were we to remand this matter to the Board that it might supply the missing basic findings. Even were the Board to make such findings on a remand, its order would have to be reversed as to almost all of the trains, since any such findings would not be supported by sufficient or substantial evidence. The original record is detailed and voluminous, and contains all the facts that might reasonably be adduced on Susquehanna's application.
We are aware that in some cases where basic findings were not supplied, the appellate court did not finally determine the matter, but remanded it to the agency. This was because of the presence of one or more of the following factors: (1) the evidence was not before the court; (2) the petitioner or the agency should have the opportunity to present additional evidence; (3) the agency had misconceived its function, or did not realize the necessity for making basic findings, and should therefore be permitted to review the evidence and make its basic findings thereon. See, for example, N.J. Bell Tel. Co. v. Communications Workers, etc., above, 5 N.J., at pages 379, 381; Delaware, Lackawanna & Western R.R. Co. v. Hoboken, 10 N.J. 418, 424-425 (1952); In re Plainfield-Union Water Co., above, 11 N.J., at pages 390-391, 395-396 (1953); Abbotts Dairies, Inc. v. Armstrong, above, 14 N.J., at pages 333-334; and Family Finance Corp. v. Gough, 10 N.J. Super. 13, 25-26 (App. Div. 1950). These factors are not present here. In addition to what we have said about further delay, the completeness of the record, etc., it is evident from the Board's decision and order that it understood its function and knew that it had to make basic findings as to the use of the trains and the adequacy of alternate facilities. In re Central R.R. Co. of N.J., 43 N.J. Super. 13, 18-19 (App. Div. 1956), cited in its decision.

*413 MONDAY THROUGH FRIDAY SERVICE.
Among the trains which the Board ordered continued were trains 835, 837 and 834. Of the weekday trains whose discontinuance is sought these, in the opinion of Susquehanna, impose the most onerous burden. Their discontinuance would enable it to save one train crew, while operation of any one of the three trains would require the retention of the crew, or paying it for two days' work. The total net savings resulting from a discontinuance of these three trains would be $26,100 a year. It is appropriate to note once more the observation made by the Board that "Only when a complete unit of equipment, crew or both can be eliminated does the discontinuance of a train produce any appreciable reduction in operating expenses." The trains should not be retained unless public convenience and necessity demands. The facts show that it does not.
Train 835 leaves New York at 5:45 P.M. and arrives in Paterson at 6:31. It carried 110 passengers in January 1955, 87 in September 1957, but only 66 in January 1958. Train 927 leaves New York 15 minutes earlier, and train 929 15 minutes later. Susquehanna proposes to consolidate train 835 with train 929. The Erie has trains leaving Chambers Street, New York, at 5:21, 5:29, 5:48, 6:00 and 6:20 P.M., arriving in Paterson 6:12, 6:15, 6:38, 6:47 and 7:09. From 5 to 7 P.M. Inter-City busses leave the Port Authority bus terminal for Paterson every five minutes, and during the rush hours additional busses are put into operation. They take 50 minutes to reach Paterson. The Manhattan Company busses leave at 5:30, 5:50 and 6:05 P.M., arriving in Paterson in 50 minutes to an hour, and this company, too, runs unscheduled busses during rush hours. The Westwood Transportation Lines also runs convenient busses.
The information as to alternate transportation has been derived from the bus and train schedules supplied in the appendix. They demonstrate that there is completely adequate *414 service from New York and Paterson and points in between serviced by train 835.
Train 837 carried 86 passengers in January 1955, 65 in September 1957, and 55 in January 1958. It leaves New York at 6:15 P.M., arriving in Paterson at 6:58. Susquehanna train 929 leaves New York 15 minutes earlier. This could serve the needs of 837's passengers. Erie train 1131 leaves downtown New York at 6:00 P.M., and No. 1133 at 6:20. As noted above, the Inter-City line, taking 50 minutes, runs to Paterson every five minutes from 5:00 to 7:00 P.M. There is a Manhattan bus leaving New York at 6:05 and 6:30 P.M., arriving in Paterson an hour later. Points intermediate to New York and Paterson would receive convenient service from the Westwood and Inter-City Bus lines.
Train 834 carried 42 passengers in January 1955 and only 31 in January 1958. It leaves Paterson at 5:30 P.M. and, after stopping at intermediate points, provides connections at Susquehanna Transfer, with arrival at New York City at 6:10 P.M. This train, like others running eastbound in the very late afternoon and early evening proceeds in a direction opposite to the heavy commuter movement. Susquehanna has offered to consolidate train 834 with train 832, now leaving Paterson at 5 P.M., to provide service out of Paterson at 5:18 P.M. This might possibly prove inconvenient to some of the 48 passengers now using train 832. If so, the Erie runs train 1170 out of Paterson two minutes after Susquehanna train 834, reaching downtown Manhattan at 6:24 P.M. The Inter-City line runs on a 12-minute schedule out of Paterson at this hour, reaching New York in 50 minutes. The Manhattan busses leave Paterson at 5:20, 5:40 and 6:00 P.M. Places between Paterson and New York have reasonably convenient service from Inter-City busses, and to a somewhat lesser extent from the Westwood busses. Any inconvenience would be minimal.
As to trains 835, 837 and 834, therefore, we find adequate alternate transportation facilities. They have the capacity to handle the additional passengers that might result from *415 the discontinuance of the three trains. They stop at all the communities served by Susquehanna in the area Paterson and east. They may be boarded reasonably close to the Susquehanna stations. Fares are comparable. The number of passengers affected are relatively few. We have examined the testimony of commuters who objected to the discontinuance of these and other trains and find that most of them would not be inconvenienced in any significant measure. A number showed unfamiliarity with available alternate transportation schedules, or claimed that the busses were not as comfortable. We find that the facts do not support the Board's order directing that these three trains be continued.
The next group of weekday trains involved on Susquehanna's cross-appeal are those known as 816, 820, 822 and 826 eastbound, and 807, 829 and 843 westbound. The record shows that the net saving from their discontinuance would be $24,100 a year. None of them operates during the hours when the Board found the principal public need for service exists.
The pertinent data regarding the four eastbound trains follows:

 Arrive No. of Passengers
Train Leave Port Authority Jan. Sept. Jan.
 No. Paterson Bus Terminal 1955 1957 1958
 816 9:30 A.M. 10:10 A.M. 37 23 56
 820 11:00 A.M. 11:40 A.M. 47 34 28
 822 12:00 noon 12:40 P.M. 41 23 19
 826 2:00 P.M. 2:40 P.M. 28 23 18

Most of the passengers on these trains use one of the Paterson stations, while a few use Hackensack. Erie trains leave Straight Street, Paterson, at 9:33, 10:22, 10:47, 11:28 and 11:50 A.M., 12:18, 1:48 and 2:23 P.M., reaching downtown Manhattan in about 45 to 50 minutes. At the hours involved Inter-City busses leave from the vicinity of Straight Street every 20 minutes, reaching the Port Authority bus terminal in 50 minutes. The Manhattan Transit Co. busses, which pass all Paterson stations, leave Paterson 20 minutes *416 before the hour, making the run to the Port Authority bus terminal in some 47 minutes, as well as on the hour, reaching the terminal in one hour. The Westwood and Inter-City busses supply service to towns between Paterson and New York at times reasonably close to the Susquehanna train schedules, although the run takes slightly longer than the trains.
The following data relates to the three westbound trains, 807, 829 and 843:

 Leave No. of Passengers
Train Port Authority Arrive Jan. Jan.
 No. Bus Terminal Paterson 1955 1958
 807 7:15 A.M. 7:58 A.M. 33 30
 829 3:15 P.M. 3:58 P.M. 61 46
 843 8:20 P.M. 9:03 P.M. 67 52

The Board had ordered the continued operation of train 807 as well as train 811, which leaves New York at 8:15 A.M., eliminating train 809 which left New York at 7:45 A.M. Susquehanna's proposal was to run only 809. In its brief the railroad makes no mention of train 811, although it is a reasonable assumption that it would accept the abolition of either that train or 807.
Erie trains leave downtown Manhattan for Paterson at 7:00 A.M., 3:10 P.M., 8:15 P.M. and 8:43 P.M. During the early morning and mid-afternoon period, Inter-City busses leave the Port Authority bus terminal every 15 minutes, and in the evening every 20 minutes. Manhattan busses are available in mid-afternoon on a 20-minute schedule. As for points between Paterson and New York, the Westwood and Inter-City busses give reasonably convenient service to those who might use the three westbound trains in question.
Here, as in the case of trains 835, 837 and 834, we find that the testimony and schedules clearly support the conclusion that there is adequate and convenient service by alternate transportation. The public convenience and necessity does not require the running of these trains.
*417 Susquehanna's notice of cross-appeal also contained an objection to the continued operation of train 933, leaving New York at 10:15 P.M., and arriving at Butler at 11:48 P.M. However, its brief makes clear that it raises this point only in connection with a proposed reinstatement of train 931 (leaving New York at 6:45 P.M. and arriving at Butler at 8:21 P.M.) as a substitute for 933. It suggested this earlier scheduling of the last train to Butler on the theory that number 931, the earlier of the two, would also act as a substitute for number 837, which it sought to have dropped. The Board determined that the retention of the later train, No. 933, would serve the public interest better than the retention of No. 931. But it presumably made this decision in light of its conclusion that No. 837 (which left shortly before No. 931) must be retained. We concluded above that the retention of No. 837 was not required by public convenience and necessity. Therefore, it will be for the Board to determine on remand whether the interests of the public and the railroad will not best be served by the departure of the last train to Butler at 6:45 P.M. or at 10:15 P.M., or at some intermediate time.

SATURDAY SERVICE.
Susquehanna also seeks the discontinuance of the following trains which the Board directed be run from Paterson east on Saturday:

 EASTBOUND
 Arrive No. of Passengers
Train Leave Port Authority Nov. Jan.
 No. Paterson Bus Terminal 1956 1958
 814 9:00 A.M. 9:40 A.M. 71 33
 820 11:00 A.M. 11:40 A.M. 90 34
 822 12:00 noon 12:40 P.M. 95 39
 824 1:00 P.M. 1:40 P.M. 74 47
 832 5:00 P.M. 5:40 P.M. 23 16

*418
 WESTBOUND
 Leave No. of Passengers
Train Port Authority Arrive Nov. Jan.
 No. Bus Terminal Paterson 1956 1958
 829 3:15 P.M. 3:58 P.M. 62 38
 853 4:05 P.M. 4:48 P.M. 102 21
 855 5:25 P.M. 6:08 P.M. 117 61
 857 6:45 P.M. 7:28 P.M. 36 26
 875 8:15 P.M. 8:58 P.M. 45 22

Inter-City busses operate every 15 minutes during the foregoing eastbound periods and every 12 minutes in the late afternoon. Westbound they operate every 15 minutes until 5 P.M., then every 12 minutes until 6 P.M., and again every 15 minutes after that hour. The Manhattan busses operate on a 30-minute schedule or less in each direction between Paterson and the Port Authority bus terminal. Erie trains are also available reasonably close to the schedule of the Susquehanna trains involved. There is a frequent and convenient bus schedule available to communities between Paterson and New York, close to the schedules of the trains here involved.
On the basis of passenger volume and available alternate bus and rail service, public convenience and necessity does not require the running of trains 814, 820, 822, 824 and 832 (eastbound), and 829, 853, 855, 857 and 875 (westbound), between Paterson and New York.
Figures submitted to the Board indicate that possible savings resulting from the elimination of these trains will produce a net savings of $15,430.
Susquehanna also seeks the elimination of two early morning trains running from Butler east  No. 960, leaving at 6:21 A.M. and arriving in New York at 7:53 via Susquehanna Transfer, and No. 962, leaving at 7:26 A.M. and arriving at 8:45. The Board concluded that these were required by public convenience and necessity. In view of the lack of evidence concerning adequate alternate transportation from west of Paterson, this finding is sustainable. *419 The trains would obviously be used by those who have to reach New York for work by 8 A.M. and 9 A.M.
Susquehanna argues that bus service is available for those who would use these trains from Paterson east. This ignores the transportation needs of those who board the trains west of Paterson. It is claimed by the railroad that the few who have occasion to go to New York can use the Erie's main line, which has six trains arriving at New York between 8:04 and 9:37 A.M., or its Greenwood Lake Division, which has trains arriving at New York at 8:12 and 9:12 A.M. This would require passengers to travel some distance to reach the Erie stations, and would bring them to New York past the hour when they should be at their work or appointments. We conclude that the trains should be retained.

SUNDAY AND HOLIDAY SERVICE.
Susquehanna seeks discontinuance of the following service which the Board ordered for Sunday and holidays:

 EASTBOUND
 Arrive No. of Passengers
Train Leave Port Authority Dec. Jan.
 No. Paterson Bus Terminal 1956 1958
 820 11:00 A.M. 11:40 A.M. 25 15
 864 1:10 P.M. 1:55 P.M. 34 25
 860 4:00 P.M. 4:45 P.M. 21 16
 836 6:00 P.M. 6:45 P.M. 28 19
 WESTBOUND
 Leave No. of Passengers
Train Port Authority Arrive Dec. Jan.
 No. Bus Terminal Paterson 1956 1958
 823 12:00 noon 12:45 P.M. 26 8
 827 2:00 P.M. 2:45 P.M. 9 8
 867 5:00 P.M. 5:45 P.M. 28 20
 875 8:15 P.M. 9:00 P.M. 36 12

This service operates solely in the area of Paterson and east.
Erie trains are available at 10:47 A.M. and 1:19, 5:32 and 5:45 P.M., eastbound, and at 12:10, 1:10, 2:10, 5:05 *420 and 8:39 P.M., westbound, from downtown Manhattan. Bus service between Paterson and New York is available every 15 minutes on the Inter-City busses and every 20 minutes on the Manhattan busses, each way. The transportation requirements of intermediate communities are adequately provided for by Inter-City busses, reasonably close to the Susquehanna train schedule. As in the case of all the other trains we have discussed, the running time of the Erie train and the busses is not unreasonably longer than that of the Susquehanna trains.
In view of the adequate alternate means of transportation and the small numbers of passengers involved, and the comparable cost and convenience, the continuance of the four Sunday and holiday trains each way is not required by public convenience and necessity.
Discontinuance of the Sunday and holiday service will result in an estimated net savings of $8,997.

XII.
As we have already noted, in Pennsylvania-Reading Seashore Lines v. Board of Public Utility Comm'rs, above, 5 N.J. 114, 121 (1950), the late Chief Justice Vanderbilt, referring to R.S. 48:12-99 which requires every railroad company to "furnish sufficient accommodations for the transportation of all such passengers and property as shall within a reasonable time previous thereto be offered for transportation at the place of starting, the junctions of other railroads and at usual stopping places established for receiving way passengers and freight for that train," said:
"* * * It seems unreasonable to interpret [the statute] as requiring the operation of passenger service in a situation when only a nominal number of passengers present themselves for transportation, where other adequate means of public transportation are available, and when such operation results in continued substantial losses."
*421 The Board was clearly aware of Susquehanna's financial condition, for it not only remarked that the railroad did not have sufficient overall income safely to carry its passenger service deficit, but that "extraordinary consideration" should be given to the financial aspects of its operations. The record, and particularly the financial statements and analyses adduced, completely convinces us that Susquehanna is suffering substantial losses in its passenger operation. These losses have been borne in an increasing degree by its freight income, but despite that fact, the railroad is having trouble meeting its fixed charges. Although it has only recently come out of a reorganization, it is still faced with grave fiscal problems. We cannot ignore the effect upon the public generally if the railroad is required to operate trains, not called for by public convenience and necessity, at a considerable loss.
In addition to the cost of providing the service to which Susquehanna objects, we have also given particularly careful attention to the use made of the 30 trains in question by the public. The number of passengers on these trains is nominal, and they can readily be absorbed by other trains and by busses. Cf. In re Central R.R. Co. of N.J., 29 N.J. Super. 32 (App. Div. 1953), and the decision of the Board of Public Utilities in In re New York Central R.R. Co. (Docket Nos. 8,509 and 8,517; No. 8,993) (1957), dealing with the West Shore Line. These cases concerned trains carrying many more passengers than those here involved, but they were allowed to be discontinued because the available bus service was considered an adequate alternate means of public transportation.
Besides costs and the public use of the service we have also examined into alternate transportation, and find it entirely adequate to the purpose. The passengers will be accommodated by other Susquehanna trains, the frequent service on the Erie line, and by the three bus companies servicing Susquehanna's area  Inter-City, Manhattan and Westwood. We do not consider such service to local passengers *422 as might be provided by Public Service Coordinated Transport. In the Central Railroad Company case, just mentioned, we sustained an order of the Board which approved certain changes in the schedule requiring 221 passengers on one train and 258 on a second to use other trains running on a reasonably approximate schedule. We there said that
"* * * Where fairly comparable substituted service is provided by the railroad so that public necessities are satisfied and where the proposed changes in service do not put the public to any major inconvenience and can be said to be warranted by serious financial circumstances, then those changes, found by the board to be advisable, should be sustained. * * *" (29 N.J. Super., at page 36)
But compare In re New Jersey and New York R.R. Co., 12 N.J. 281 (1953), a case where the court affirmed the Board's refusal to permit discontinuance of a certain train. In that case, however, the number of passengers carried had increased, there was no proof of adequate alternate bus service, and no satisfactory proof of operating losses.
That common carrier busses operated by responsible companies constitute an accepted and acceptable alternate means of public transportation was not only established in the Central Railroad case, above, 29 N.J. Super. 32, and in the New York Central case, above, decided by the Board, but in the leading case of Pennsylvania-Reading Seashore Lines v. Board of Public Utility Comm'rs, above, 5 N.J. 114.
Resolved in the light of the three major factors which must be considered in dealing with the question of public convenience and necessity  cost of providing the service, public use of that service, and the availability and adequacy of alternate transportation facilities  there is little or no support for the Board's conclusion that Susquehanna must continue to run 28 of the 30 trains we have been considering. That conclusion, as we have said, was unaccompanied by basic findings of fact sufficient to support it; and had there been such findings there is not sufficient or substantial competent *423 and relevant evidence in the record that would have validated them.
We conclude that except for trains 960 and 962, operating out of Butler to New York on Saturday, the train service which Susquehanna seeks to discontinue should have been ordered curtailed by the Board.

XIII.
In appealing from the orders of December 11 and 20, 1957, Commuters and the Brotherhood claim that no hearing was afforded them before the Board entered its order approving the curtailed schedule. The contention is not pressed. We find no merit in it. First, the December 11 order in itself practically established the schedule, merely directing that the railroad prepare and submit one for the Board's approval. The new schedule followed the Board's decision. Second, the schedule came before the Board again for amendment soon after, on notice, and on February 27, 1958 the Board entered an order modifying its decision and order of December 11, 1957 to the extent of substituting train No. 931 for train No. 933.
One other minor matter requires consideration lest it be considered that we overlooked it. Commuters and the Brotherhood claim that the Board committed error by permitting Susquehanna to withdraw trains 907 and 924 which carried children to and from school in the mornings and afternoons, and to provide bus transportation instead. There is nothing to show that the needs of the school children are not completely met by the substituted service. Apparently the only real basis for the objection is that discontinuance of these two trains will mean that the crew or crews involved will no longer be needed for the particular operation. There is no persuasive showing that the Board exceeded its power in approving the substituted service, or that this service is in any degree unsatisfactory. The common sense approach of the Board cannot be rejected.

*424 XIV.
The elimination of the trains in question will result in the transfer of a relatively small number of passengers to available bus and train facilities. There is even the possibility of some small increase in automobile traffic. However, we find no showing in the record, nor indication of any expert knowledge the Board might have, which would support the suggestion that the elimination of the particular trains with which we are concerned would have an adverse effect on highway conditions. Nor can we accept the expression of the Board, contained in the quotation set out in I at the beginning of this opinion, that the elimination of service at certain periods "might have an adverse effect on the travel programs of a large number of persons and on the alternate public transportation in the area." (Italics ours) "Might" is a probability that finds no reflection in the proofs, and the same is true of "large."
The report of the Metropolitan Rapid Transit Commission, referred to above, speaks generally of the need for maintaining present transit facilities. But a considerable portion of this document is devoted to travel during commuter hours, and there is no finding that whatever increased highway traffic might result from the present curtailment of non-commuter-hour trains would have any significant effect.
The decision we have reached is, of course, in no way to be construed as providing a "green light" for all future applications for the discontinuance of particular rail passenger service. Each case must be bottomed on its own particular facts. The position of Susquehanna is not necessarily that of other railroads with passenger service deficits. We have already referred at length to that railroad's precarious financial situation, a situation recognized by the Board. We also note that, except for that portion of Susquehanna's lines extending west from Paterson, it operates in an area where bus service is extraordinarily complete. This alone would distinguish it from those railroads which *425 serve areas more distant from New York City, where bus travel may be considerably longer in space and time, and more expensive than rail commutation. This is borne out by the data compiled in the Commission report, showing that Bergen and Passaic Counties, with which we are here concerned, are the only two of the 17 counties considered in which the number of passengers transported by bus exceeds the number carried by rail.
The danger involved in relying on such extrinsic sources as the report of the Metropolitan Rapid Transit Commission can be indicated by a reference to that portion of its recommendations dealing with the necessity for the continued operation of commuter railroads. After discussing the acute problem created by "pending requests" of various railroads to "cut back on service or to abandon lines completely," the report states:
"* * * There are cases where minor railroad lines, particularly in the northern section of New Jersey, might be replaced more economically by bus service. In the case of commuter rail service provided by the Pennsylvania, Lackawanna, Jersey Central and main line of the Erie, however, it is the Commission's opinion that the substitution of buses or automobiles as the means of transportation in the areas served by these lines would have a seriously adverse effect upon the economy and public convenience of New York City and the entire metropolitan area." (at page 30)
The failure to mention Susquehanna may be significant.
We do not refer to the Commission report as support for our decision in any degree. Rather, we have adverted to portions of it to support our determination not to remand the matter to the Board for yet a third set of hearings in order for it to spread on the record further evidence which might, perhaps, bolster its conclusion. We find no indication that there is evidence of that nature, nor has the Attorney General or the objectors represented such to be the case.
All parties had full opportunity to be heard  and at length. We will not require a rehearing on the remote possibility that further relevant data may be presented.

*426 CONCLUSION.
We have here set out our conclusions as to public convenience and necessity insofar as concerns those trains over which there is dispute. However, we recognize that the railroad must pay a full day's wages to any employee working part of a day, and all parties agree that the running of additional trains by a crew which is normally required to be on duty does not greatly add to the railroad's costs. The possibility exists that the revenue to be derived from the operation of such additional trains within the framework set out above will exceed the operational costs involved. If this be so, the additional trains will, of course, benefit both Susquehanna and the passengers who might be accommodated thereby. The Board should give consideration to this matter. At the same time the Board will have an opportunity to convert such "dead-head" train movements as may remain, into revenue trains. The Board will then adjust Susquehanna's schedule to conform with this opinion.
Accordingly, the matter will be remanded to the Board for action not inconsistent with this opinion. The objectors shall be permitted to participate in any further consideration of the matters outlined.
No costs.
CONFORD, J.A.D. (dissenting).
My examination of the briefs and appendices on these appeals satisfies me that the final decision of the Board of Public Utility Commissioners is legally sustainable as to all of the trains involved, subject to clarification of the stated findings and conclusions of the Board, and, possibly, to a statement by the Board of official notice on the record of certain additional facts and circumstances, with opportunity to the parties to meet such data by evidence and argument. Since this course is feasible by remand of the case to the Board I cannot concur in the reversal by the majority of the court of the determination by the Board that certain specified Susquehanna trains be required to continue in service.
*427 I concur in the disposition by the court of the arguments advanced by the Commuters Association and the Brotherhood of Railroad Trainmen in attacking the decision of the Board insofar as it granted the Susquehanna part of the relief it sought.
In my view, this is not merely another run-of-the-mill train discontinuance case. It concerns a substantial link in the network of rapid transit of the North Jersey metropolitan area. It has been litigated and is being decided at a time when the metropolitan area rapid transit situation presents one of the gravest of present-day challenges to community statecraft. A steadily increasing number of other train discontinuance (and rate increase) cases in that general area have been filed. Many have been disposed of and others are in process of consideration by the Board. The practical definition by this decision of the extent of agency power, judgment and discretion in cases of this kind may bear critically upon the outcome of those matters.
The provision of ultimate wise solutions of the general critical transportation problem, in the overall public interest, is, of course, not for us. But a consideration of the expressed views of those whom the responsible authorities have delegated to investigate the problem tends to emphasize, in application to the case before us, the soundness and timely pertinence of the general principle favoring the judicial upholding of the arm of the administrative agency where its determination is substantially supportable in fact and policy, particularly where there is implicated a heavy element of the interest of the general public in respects as to which the agency has presumptive specialized competence.
The report of the Metropolitan Rapid Transit Commission, dated January 1958, to the Governors of the States of New Jersey and New York, surveys the critical matter of deterioration of rapid transit by rail in the New York metropolitan area. The problem of people travelling between North Jersey and New York City, particularly commuters, is considered its most grevious phase. A summary *428 by the Commission of the three basic rapid transit needs of the area referred to lists as two of them: "1. Maintenance of essential existing suburban transit services; 2. Improvement of those services, particularly the Hudson River crossings, to make them a more useful segment of the total transportation system" (p. 16 of Report).
Of particular relevance to what I shall have to say hereinafter is the Commission's conclusion that the alternative to adequate suburban rail transit is either "severe congestion of highways and urban streets," with strangulation of movement and economic losses, or staggeringly expensive new highways, river crossings and urban parking areas. (Ibid.) In other words, any marked shift of travellers from rail to motorized transportation in the area involves grave difficulties. The substantial recent dependence of daily commuters from New Jersey to New York on rail transit, as compared with bus or private car, is indicated by a 1956 survey showing, of a total of about 151,000 persons, 75,000 using rail, 48,000, buses, and 28,000, automobiles (p. 15 of Report). For Hudson, Bergen, and Passaic Counties, the areas most relevant in the present case, the figures are, respectively (in thousands):

 Rail Bus Auto Total
Hudson ................. 14 7 3 24
Bergen ................. 15 29 10 54
Passaic ................ 2 3 2 7

Thus, any governmental decisions concerning the dropping of trains on the theory that passengers can find their way to New York and back (or vice versa) by bus or private car involves choices in which whatever legitimate ends are served by such steps must be weighed against the undesirable effects just discussed and others to be mentioned. The problem is one of degree, and it involves determinations concerning the overall public good, on balance and consideration of all relevant factors. The elements of comparison, informed judgment and discretion loom large in *429 the process, whether exercised by a legislature acting in its proper domain or an administrative agency passing upon the public convenience and necessity in a contested train discontinuance case.
I turn my attention to the specific subject matter before us, with emphasis on the trains between Paterson and the Port Authority Bus Terminal in Manhattan (via bus between Susquehanna Transfer and New York City). The Board gave the railroad very substantial relief on its week-day runs. Of a total of 34 eastbound week-day trains formerly operated the order permitted it to drop all but 12, only five more than requested. A comparable degree of relief was allowed as to westbound service. The week-end and holiday service was also substantially reduced, the Saturday service eastbound being cut by 12 trains out of 19 run. A total of some 88 trains in all were permitted by the Board to be dropped.
While finding the evidence and special findings of the Board legally sufficient to sustain its action as to the trains it ordered dropped, the court has found to the contrary as to 27 of the 30 trains which the Board ordered to be continued over the objection of the railroad. In other words, by action of the court, Susquehanna achieves riddance of practically all the trains it sought to drop under its amended petition before the Board, and this against the considered expert judgment of the administrative agency charged with the responsibility for such decisions by the legislature, after full hearing.
Before referring to the evidence which satisfied the court of the merits of the cross-appeal some comment concerning the findings of the Board is necessary. The ultimate criterion of what is required to be shown for relief in a train discontinuance case is the consistency of the relief sought with the public convenience and necessity. The authorities are fully set forth in the majority opinion. There is no flat conclusion anywhere in the "Decision and Order" of the Board that the public convenience and necessity permits the *430 discontinuance of any of the trains the Board ordered dropped; nor that public convenience and necessity precludes the dropping of those the Board ordered retained in service. The document is sprinkled with references to public convenience and necessity, however, and it is therefore argued on behalf of the Board that it is sufficiently implied that the ultimate determinations were based on that criterion. Normally such implications might be justifiable, 2 Davis, Administrative Law (1958), § 16.07, pp. 455, 456. But the present case involves, additionally, unsatisfactory language in the opinion relating the specific decisions as to particular categories of trains to the underlying facts and considerations of policy and judgment mentioned in the "Decision and Order." The courts are not concerned with mere formalities of expression but with a statement of findings and conclusions which will permit the judicial review function to operate with due regard to the allowable scope of administrative judgment and discretion while at the same time precluding arbitrary or clearly unreasonable action. Delaware, L. & W.R. Co. v. City of Hoboken, 10 N.J. 418, 426, 427 (1952).
The critical sections of the opinion portion of the Board's "Decision and Order," in relation to the foregoing, insofar as this dissent is concerned, read as follows:
"So far as public convenience and necessity is related to the service rendered by the New York, Susquehanna and Western Railroad, it might be said that west of Paterson the emphasis must be on the necessity, while the area between Paterson and New York produces the emphasis on convenience or preference as to the type of transportation used. This distinction was recognized by the Railroad when it admitted that some rail service is needed in the area west of Paterson. The Company claims, however, that there is adequate alternate service in the area between Paterson and New York.
Study of the use of New York, Susquehanna and Western Railroad trains shows that there exists a need for such transportation throughout the day and on each day of the week but that the density of such traffic varies greatly during the day and on certain days. When the demand is at a high level there is no question of the need for service but there is some question of the actual need when the *431 demand is reduced. The present schedule provides a uniform service throughout the day which varies with the use of the trains. Since the service is provided and is used throughout the day the elimination of all service at certain periods might have an adverse effect on the travel programs of a large number of persons and on the alternate public transportation in the area. It is the opinion of the Board, therefore, that any relief that might be granted in this proceeding should be in the nature of a reduction of service throughout the day rather than the elimination of service during long periods of time." (Emphasis added)
Among the specifically enumerated "Findings," of which there are eleven, I call attention to these:
"3. That there is sufficient alternate public transportation between Paterson and intermediate stations and New York to supplement the rail service which may be provided.
"4. That the public need for service (Mondays through Fridays) is principally during commuter hours. (Eastbound arriving in New York between 7:00 A.M. and 9:30 A.M. and westbound leaving New York between 4:00 P.M. and 6:30 P.M.).

* * * * * * * *
"7. That in addition to trains numbers 906, 908, 910, 912, 916, 919, 923, 927, 929 and 931 additional trips as shown hereafter (Mondays through Fridays) should be operated between Susquehanna Transfer and the Straight Street station in Paterson, plus train 933 from Susquehanna Transfer to Butler."
I have not set forth other portions of the opinion portion of the Decision and Order, which, taken together with the ordering part, might justify inferences of findings of facts justifying the decision of the Board to allow discontinuance of the trains permitted to be dropped. These I do not discuss as the primary subject of dispute which divides this court is the refusal of the court to sustain the Board with respect to those trains it ordered to be continued. The first and most important phase of this is the week-day traffic in non-rush hours. The Board deals with this in the second full paragraph quoted above. It is first stated that "there exists a need for such transportation throughout the day and on each day of the week * * *" (emphasis added). There then follows: "but there is some question of the actual need when the demand is reduced." These statements *432 seem inconsistent on the surface. The Board then states that "the elimination of all service at certain periods might have an adverse effect on the travel programs of a large number of persons and on the alternate public transportation in the area" (emphasis added). Therefore, concludes the Board, relief in non-rush hours "should be" afforded by reduction of service in such periods rather than complete elimination of it.
It is my view that in order to lay a basis for sustaining its decisions as to the trains it ordered continued the Board's conclusions concerning the need for non-rush hour service should have been stated in more definite form and that it should have formulated its conclusion as to the adverse effect of total discontinuance of trains during those periods on the travel programs of train users and on alternate public transportation in the area, in terms of affirmative probability rather than mere possibility, as suggested by the language "might have an adverse effect, etc." Moreover, additional specific and explanatory findings concerning the noted adverse effect of such total discontinuance of trains are highly desirable for facilitation of review, if not absolutely essential to the validity of the ultimate decisions made as to particular trains. Since I am satisfied, however, that there is substantial likelihood that the Board could clarify and amplify its findings and conclusions in such manner as to validate its decisions as to all of the trains in question (and I will develop this further hereinafter by examples from the record and facts properly subject to official notice by the Board), a result which in my judgment would comport with the public interest, I am for remanding the case to the Board rather than reversal of its decision for insufficiency of findings and conclusions. Cf. Elizabeth Federal Savings & Loan Ass'n. v. Howell, 24 N.J. 488, 507 (1957).
In any of its quasi-administrative functions the Public Utility Board has "full latitude to avail itself of the wealth of general information and expert knowledge which it obtains *433 in the performance of its day-to-day administrative activities," as well as data produced in other proceedings before it, so long as official notice of such matter is taken in the subject proceedings with opportunity for refutation by the parties adversely affected thereby. Pennsylvania Railroad Co. v. Dept. of Public Utilities, 14 N.J. 411, 427 (1954); Elizabeth Federal Savings & Loan Ass'n. v. Howell, supra. In the case of such administrative agencies as the Board of Public Utility Commissioners, charged by law with the determination of what is required by public convenience and necessity in terms of the concrete problem as to whether certain specific trains shall be permitted to be discontinued and their customary passengers left to find other means of transportation, the elements of general background, special knowledge and expert judgment on the part of the Board become paramount. Cf. New York, Susquehanna and Western Railroad Company v. Board of Public Utility Commissioners, 29 N.J. 513 (1959). As stated by Davis, "we want the appraisal of the evidence to be guided by experience, not limited to literal words of witnesses. We want both understanding and knowledge to influence the exercise of judgment or discretion." 2 Davis, op. cit., supra (§ 15.01, p. 342). For another example, the honest and sensible judgment of a tax assessment board in appraisal of the value of property may "express an intuition of experience which outruns analysis * * *," Chicago, B. & Q. Ry. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636 (1907) (per Holmes, J.).
It is my conception that when a court is called upon, as here, to review the complaint of a railroad that, after being granted the substantial relief the Board accorded this appellant after hearing, it was not given everything it asked for, it should proceed, in the first instance, on the assumption that the Board's determination was in all things soundly grounded, and, when faced with facts arguably indicating the contrary, see whether judicial circumspection does not fortify presumption by providing insights as to considerations *434 of judgment and discretion which may properly have supported the Board decision, whether or not perfectly articulated in its ruling. If so, the public interest calls for salvaging the ruling by remand and reparation of the proceedings rather than nullification by reversal on the merits. It is the economy and well-being of a whole geographical area that is affected, directly or indirectly, in such a proceeding as this, not merely the rights and welfare of the immediate parties. Unless the action of the Board is properly found arbitrary or clearly unreasonable it appears to me to be the duty of this court to be astute to find ways of sustaining, not defeating, the exercise of its expert judgment in this matter; and this as to the cross-appeal as well as main appeal.
Now for illustration of the foregoing from the record.
The court overrules the Board as to the Monday-Friday trains ordered maintained from Paterson to the Port Authority Terminal in Manhattan via Susquehanna Transfer on the ground that there is adequate alternative service by Erie Railroad or one or more bus lines. This conclusion is drawn by comparing timetables for the other means of transportation with that of the Susquehanna trains argued to be dispensable and finding the variations of from five minutes to a half hour or more in time and of from a block or so to several miles in distance of destination or origin not to be material to the displaced Susquehanna train-user. For example, in reference to Erie trains as alternates, while the Susquehanna trains terminate (via contracted-for bus connection at Susquehanna Transfer) at the Port Authority Bus Terminal at 40th Street, Manhattan, the Erie trains terminate with a ferry ride to Chambers Street, several miles south on Manhattan. The Susquehanna train trip takes 40 minutes; the Erie anywhere from 44 to 52 (generally 51). To the travel time of the latter would have to be added the time it takes to go from Chambers Street to 40th Street (not to mention the added expense). (While it is true that access may be had from the Erie Railroad Station *435 in Jersey City to 33rd Street, Manhattan, by H. & M. tubes, the record does not show how long the total Erie trip, including the H. & M. ride, would take; presumably the Board knows that fact and has considered it.)
People who travel to work generally have to report at fixed hours. They generally are not excused from work until a fixed hour. It cannot be assumed that excess travel periods of even as little as a few minutes may not be critical in the case of a particular traveller, much less as to the substantial divergencies in some of the time schedules on the "alternative" media referred to by the court, shown or inferable here. See In re New Jersey & New York R. Co., 12 N.J. 281, 289, 290 (1953).
Since the date of the Board decision in the present case Erie has discontinued its ferries and has consolidated its passenger operations with those of the Lackawanna. Its passengers now get to New York via Lackawanna ferries terminating in the general vicinity of the former Erie ferry terminal at Chambers Street, so that the situation in this respect may be assumed to be the same as formerly insofar as the average Erie traveller is concerned. See New York, Susquehanna and Western Railroad Company v. Board of Public Utility Commissioners, supra (29 N.J., at page 519).
The record does not show how many of the travellers on the disputed Susquehanna trains originate or terminate at the way stations of East Paterson, Rochelle Park, and Maywood. Examination of the time tables of the bus companies relied upon by Susquehanna to supply alternative transportation by that means does not satisfy me that travellers to and from those places are necessarily adequately served in that manner, time-wise. This is particularly apparent as to such trains as 807, 816 and 834. Moreover, and while not of decisive importance in relation to a carrier with substantial passenger-operation losses, some weight may properly be accorded by the Board to testimony as to the discomfort of travelling by crowded buses, frequently involving *436 standing, as well as delays, which one passenger described as "the worst of all" the disadvantages of bus travel.
I cannot agree with the implication in the argument of the railroad that we need have concern here only with the commuter who travels standard rush-hour trains. While the rapid transit problem is most acute at the peak of travel hours, there is no less general necessity for train service in non-rush hours. Some of the trains ordered dropped by the court, moreover, are quite close to "rush hour" periods. The proofs indicate that there is substantial need for non-rush hour rapid transit facilities in the area in question and the Board may reasonably gear its policy judgments on the predicate that existing rail lines should be expected to shoulder a fair share of it along with bus lines and the resources of the self-propelled commuter travelling in his own car or via car-pools. The substantial extent of general non-rush hour travelling from all suburbs into New York City is indicated by the report of the Metropolitan Rapid Transit Commission, cited above, which shows that of a total of 898,000 such travellers, rush-hour travellers (7-10 A.M.) number 370,000, others 528,000. But private cars transport 357,000 of the latter, trains 114,000 and buses 57,000 (compared with 99,000, 208,000 and 63,000, respectively, for rush-hours) (p. 14). Presumably this information is part of the general knowledge and background of the Board.
Nor is it correct to assume that there are not many workaday commuters travelling in the so-called off-hours, or on Saturdays, Sundays or conventional holidays. Some of the testimony in the present case substantiates general knowledge to the effect that many commuters work at unconventional time schedules, some on night shifts and many at jobs or in businesses having irregular closing hours, wherein some flexibility of train schedules for purposes of return travel is of great importance. Train riders in non-rush hour periods also include students, shoppers, military trainees, visitors to doctors, theatregoers and seekers after various *437 other forms of recreation. Many Susquehanna commuters drive to the railroad stations, and the dropping of some of the trains here in contention will seriously inconvenience some of them, as alternate routes of travel home will not bring them back to the location of the parked car.
In sum, the average traveller by Susquehanna at other than conventionally classified peak-hours is a member of a substantial segment of the train-riding public, whose trip, going or coming, is more likely than not to be either for purposes of earning a living or the pursuit of other needs not unimportant in society. It seems to me hardly deniable that a conclusion by the Board that some of these trains should be retained to obviate excessively adverse effects on the travel programs of such classes of train riders as these would be factually supportable in this record and appropriately constitute a substantial factor in the overall determination of the Board as to which trains should be retained or dropped, as a matter both of public convenience and necessity and the fair consideration of the legitimate complaints of the carrier. As already noted, however, the stated finding by the Board needs revision by articulation in terms of affirmative probability of the adverse effects mentioned if it is to have status to support the ultimate decision. The weight I would accord the subject matter would ultimately depend upon clarification of the finding on a remand.
Another element in the Board's reasoning noted above was that of the adverse effect of elimination of non-rush hour trains of the Susquehanna "on the alternate public transportation in the area." While the Board's mode of statement of conclusion in this regard is subject to the same criticisms as already made herein in reference to the conclusion concerning adverse effects upon travel programs of commuters, nevertheless the substantive point has significant implications in terms of the public interest.
One of the alternative media is the Erie Railroad. It is inferable from the testimony that Erie might have to add cars to their trains to handle the passengers from the dropped *438 Susquehanna trains. A representative of the Erie testified the road would be willing to do so. However, the Board might have had legitimate reservations as to the weight it should accord to such representations in view of the accelerating drive by almost all suburban commuter railroad lines in recent years to drop passenger service, increase fares and generally discourage growth of passenger business. Cf. Pennsylvania R.R. Co. v. Board of Public Utility Commissioners, 48 N.J. Super. 216, 230 (App. Div. 1957).
But of most importance, in my view, is that aspect of the mentioned finding of the Board which may be understood as referring to the effect, through the dropping of trains, of the increased use of buses and other means of transportation by motor. The Board may well have had in mind that such increases would tend in the direction of exacerbation of our already overcrowded highways and tunnels approaching the New York bridge and tunnel crossings of the Hudson. Operators of bus lines testified they would be willing to add equipment to handle displaced train passengers. Moreover, it is common knowledge that increasing numbers of refugees from the disintegrating rail passenger services are driving to New York in private cars, singly and in car-pools. All of this, of course, tends toward further unbalancing the ratios of rail-bus-auto handling of the trans-Hudson passenger traffic which the Metropolitan Rapid Transit Commission deems should be maintained in the public interest until stable overall solutions can be achieved consistent with economic justice to the suburban passenger rail carriers (Report, supra, pp. 15, 16). The foregoing considerations, in my judgment, could well have played a part in the exercise of the Board's judgment and discretion as to how many of the applicant's trains it should permit to be dropped. In Application of Illinois Central R. Co., 241 Iowa 333, 338, 41 N.W.2d 98, 100 (Sup. Ct. 1950), an appeal involving a grant of a certificate of public convenience and necessity by a utility regulatory agency, the court said (41 N.W.2d, at page 100): "We are of the opinion that the commission can and should *439 consider the general transportation problem that affects this state as well as the nation as a whole." And see 2 Davis, op. cit., supra (§ 15.13, p. 422). I would give the Board the opportunity, by remand, to say more particularly whether these or other comparable considerations constituted factors in its determinations.
It might be ventured, in rebuttal of the foregoing, that only a relatively few train passengers are involved in this case in comparison with the total volume of daily travellers in the affected area and that no substantial impingement on the large general transit problems mentioned above could result from the court's decision on this particular cross-appeal. As to this, firstly, the numbers of people affected here are not of themselves inconsiderable. But, more broadly, such problems are always matters of degree, for the judgment of the expert agency in charge. Ignoring a harmful tendency in a particular case may lead to the full-bloomed evil by aggregation of results in the totality of cases.
To epitomize my viewpoint on the entirety of the matter, the final assessment of the requirements of public convenience and necessity in relation to the running of particular trains is a complex judgment-discretion process for exercise by the administrative agency  one resting both on particular facts proven in evidence and the great residuum of relevant data, knowledge, experience and background bearing upon the interrelated problems at the command of the Board. The agency necessarily proceeds upon "an inseparable mixture of experience and information." 2 Davis, op. cit., supra, § 15.01, p. 339. If, after giving due consideration to the economic plight of the railroad, the extent of the need of area travellers for these particular trains, the need of area travellers, generally, for public rapid transit facilities of all types and the place in the satisfaction of that need of these trains, the availability of alternate means of transportation and the comparative advantages and disadvantages of such alternate means in terms of origin and destination schedules, total elapsed travel times, accessibility *440 to origin and destination points, expense and comfort of the alternative media, the effects of shifts of passengers from these trains to other trains or motorized equipment using the highways, bridges and tunnels, and whatever else the Board reasonably deems relevant to the public interest, the Board arrives at specific conclusions in terms of trains to be retained or dropped which do not appear clearly arbitrary or unreasonable or without rational foundation in perceivable combinations of fact, judgment and discretion, the conclusions should be sustained by a reviewing court.
Mutatis mutandis, the same general reasoning by which I would sustain the Board's determinations (on proper findings and conclusions) as to week-day trains ordered to be continued applies to the Saturday, Sunday and holiday service. The Board found that a need for some service at these times existed. Testimony by individual passengers sustains the finding. The Board radically cut the number of trains previously provided for these periods. I cannot say that its implicit conclusion that the few remaining trains it ordered continued are needed, as a matter of public convenience and necessity, is so insupportable as to justify substituting my own inexpert judgment as to such matters for that of the agency to which the Legislature has delegated the responsibility.
My vote is to remand the entire matter to the Board so that it may take such official notice on the record of such additional facts and circumstances, whether those mentioned in this opinion or otherwise, as it may desire, and give all parties an opportunity to meet any new matter either by proofs or argument, and for the making by the Board of new, amended or supplemental findings of fact and conclusions.